NATIONAL WILDLIFE FEDERA-TION, Environmental Council of Sacramento, Friends of the Swainson's Hawk, Planning and Conservation League, and Sierra Club, Plaintiffs,

v.

Gale A. NORTON, Secretary of the Interior, and Steven A. Williams, Director, United States Fish and Wildlife Service, Defendants.

No. CIV–S–03–0278 DFL/JFM.

United States District Court,
E.D. California.

Feb. 4, 2004.

Laura Marie Robb, Earthjustice Legal Defense Fund Inc., Oakland, CA, John F. Kostyack, Esq., National Wildlife Federation, Washington, D.C., for National Wildlife Federation and Sierra Club.

Edmund F. Brennan, Assistant U.S. Attorney, Sacramento, CA, Keith W. Rizzardi, U.S. Department of Justice, Environment and Natural Resources Division, Washington, D.C., for Defendant Gale A. Norton.

Edmund F. Brennan, Esq., Assistant U.S. Attorney, Sacramento, CA, for Defendant Steven A. Williams, Director of U.S. Fish and Wildlife Service.

## MEMORANDUM OF OPINION AND ORDER

LEVI, Chief Judge.

Plaintiffs are various environmental organizations who challenge the Secretary of the Interior's issuance of an incidental take permit under the Endangered Species Act ("Act") for the proposed Metro Air Park ("Metro") development. The development is located adjacent to the Sacramento International Airport in an area of Sacramento known as North Natomas.[1] Based on Metro Air Park's proposed Habitat Conservation Plan ("Plan"), the Secretary, through the Fish and Wildlife Service ("Service"), issued an incidental take permit to the Metro Air Park Property Owners Association ("Association"). Plaintiffs challenge the Plan and the permit principally on the grounds that (1) the Association has not ensured adequate funding for the mitigation measures and (2) the required mitigation is not the maximum practicable. The parties have filed cross-motions for summary judgment.

1. The court previously set aside a permit issued to the City of Sacramento based upon a Habitat Conservation Plan for the entire Natomas Basin. *National Wildlife Federation v. Babbitt*, 128 F.Supp.2d 1274 (E.D.Cal.2000). The Natomas Conservation Plan is not the subject of this action, although it is part of the background of events leading to the development of the Metro Air Park Plan.

2. Of the species covered by the permit, two are currently listed under the Act: the Giant

## I. Facts and Procedural History

### A. The Metro Air Park Project

The Metro project site is located next to the Sacramento International Airport, between Elkhorn Boulevard and Elverta Road. (AR 6007.) The site is located within the Natomas Basin in Sacramento County. (AR 6004.) The project contemplates development of all 1,892 acres of the site, as well as about 100 acres of adjoining land needed for infrastructure. (AR 6007) The development would include commercial, light industrial, and office space, hotels, a golf course, and necessary roads and infrastructure. (AR 6007.) The site is now composed almost entirely of agricultural lands, mostly rice fields. However, the land has lain fallow for several years. (AR 6013–14.) When in active rice cultivation, the land provides valuable habitat for the Giant Garter Snake; in its current fallow state, however, the habitat value of the land is minimal to both the snake and the Swainson's Hawk, the two species of greatest concern. (AR 7139.)

### B. The Affected Species

The permit covers 14 species, but the parties focus exclusively on two: the Giant Garter Snake and the Swainson's Hawk.[2] The Giant Garter Snake is a threatened species under both federal and state Endangered Species Acts. 50 C.F.R. § 17.11; 14 C.C.R. § 670.5(b)(4)(E). The snake lives near slow moving water, and the canals and irrigation ditches associated with

Garter Snake and the valley elderberry longhorn beetle. Two were formerly listed: the Aleutian Canada goose and the peregrine falcon. Ten are federally unlisted: the Swainson's Hawk, the white-faced ibis, the bank swallow, the greater sandhill crane, the tricolored blackbird, the northwestern pond turtle, the loggerhead shrike, the burrowing owl, the Delta tule pea, and the Sanford's arrowhead. The Swainson's Hawk is listed under the California Endangered Species Act.

rice farming can provide suitable habitat. (AR 7066.) Because the snake may range over distances of up to five miles in a few days, connectivity of the wetland habitat is important to the snake's survival. (AR 6020, 7067.)

The Swainson's Hawk is listed as threatened under the California Endangered Species Act. 14 C.C.R. § 670.5(b)(5)(A). The hawk nests in the Natomas Basin in the summer time and migrates south for the winter. (AR 7071–72.) The hawk feeds primarily on rodents and so requires open fields and grasslands, with large nesting trees providing panoramic views. (*Id.*) Fields that lack adequate prey populations or that make for poor hunting because of vegetation height or density are not suitable habitat. (*Id.*)

### C. The Habitat Conservation Plan

The Metro Plan adopts a number of mitigation measures to minimize the impact of development on covered species. The most important of these is the Plan's provision for habitat acquisition to mitigate habitat lost to development.[3] The Plan requires that for every acre of land developed, half an acre of habitat be permanently protected and managed to maximize its conservation value. (AR 6000.) Thus, the Plan adopts a 0.5:1 ratio, with the ratio based not on habitat lost but on total land developed regardless of its value as habitat. (*Id.*) Because the Plan contemplates development of the entire site, conservation land will be purchased off-site.

The Plan closely regulates the purchase and management of mitigation lands. Seventy-five percent of the mitigation lands must be maintained as rice fields or managed marsh. (AR 6052.) This would primarily benefit the snake. The remaining 25% would be preserved as upland habitat, primarily benefitting the hawk. (AR 6053.) The Plan further requires that mitigation lands consist of two habitat blocks of at least 400 acres with an interlinking water supply. (AR 7128.) All mitigation lands must be acquired within the Natomas Basin, with a requirement that 25% be in Sacramento County. (AR 6570–71.) There is no requirement that any of the lands be adjacent to or near the Metro Air Park site. In addition to the mitigation lands purchased under the 0.5:1 ratio, the Plan requires the establishment of a Swainson's Hawk preserve consisting of 200 contiguous acres to compensate for the loss of a nest tree within the Metro site.[4] (AR 6053.)

At full development, the Plan requires the purchase and maintenance of 1208 acres of mitigation land. (AR 6001.) The purchase and management of this land is delegated to the Natomas Basin Conservancy ("Conservancy"). (AR 6041.) The Conservancy is a non-profit corporation, already in existence, whose purpose is the purchase and maintenance of habitat land in the Natomas Basin. (AR 7032.) The Plan incorporates the Conservancy's acquisition criteria.[5] (AR 6035.) These criteria require that all land purchased as mitiga-

---

3. Other mitigation measures include several intended to reduce harm to the snake during construction and the requirement of best management practices for rice farming, should that activity be resumed at the site prior to development. (AR 6052–6063.)

4. The Plan requires that this land, along with the other upland habitat purchased, must be planted with the native trees preferred by nesting hawks. (AR 6054.)

5. Plaintiffs maintain that the Natomas Basin Plan is not properly part of the record in this case. (Pls.' Reply at 18–19.) However, the relevant portions of the Natomas Basin Plan are attached to the Metro Plan as Appendix A. (AR 6091–6107.) The court did not find it necessary to refer to any part of the Natomas Plan not actually incorporated into the Metro Plan.

tion land be suitable as habitat for the covered species. For example, lands acquired as wetlands mitigation must contain the appropriate soils to support marsh or rice farming, have adequate setbacks, be hydrologically connected to other parcels, and have an adequate water supply. (AR 6093.) There are corollary criteria for upland mitigation purchases. (AR 6105.) There are also detailed management programs to maintain wetlands for the benefit of the snake and other wetland species and to maintain uplands for the hawk and other upland species. (AR 6092–6107.)

The mitigation measures in the Plan are funded through mitigation fees paid by each developer when the developer obtains a grading permit. (AR 6000–01.) These fees are currently set at $10,027 per acre.[6] (Defs.' Mot. at 14.) There are a number of measures intended to ensure adequate funding for the mitigation requirements. The fees are subject to automatic annual adjustments, tied to the rate of inflation. (AR 6049.) The Conservancy also possesses the authority and responsibility to raise the fees to adjust for any increased costs of achieving the required mitigation ratio or maintaining the habitat value of the conservation lands. (AR 6045.)

Additionally, each developer must become a member of the Metro Air Park Property Owners Association and subscribe to its Covenants Conditions & Restrictions ("CC & Rs"). (AR 6007.) The Association is the permittee and is required to implement all of the provisions of the Plan, upon which the permit is conditioned. The permit also requires the Association to adhere to the Metro Air Park Implementation Agreement ("Agreement"). (AR 6592.) The Agreement further obligates the Association to carry out

the provisions of the Plan. (AR 6559–60.) The CC & Rs give the Association the authority to raise fees as necessary. (AR 17199.) The Association has the authority to place a lien on any parcel whose owner refuses to pay additional fees assessed by the Association. (AR 6050.)

Finally, the Plan requires a program review after development of the site has reached 800 acres, or roughly the halfway point. (AR 6066.) During the review, an additional 200 acres may be developed; therefore, a maximum of 1000 acres may be developed before completion of the review and re-certification of the Plan and the permit. (*Id.*) This allows for adjustments to the Plan for changed conditions such as spikes in land costs or the unavailability of adequate mitigation lands on the open market. The Plan also requires that all of the required mitigation land must have been purchased before the issuance of grading permits for the final 10% of land within the Metro site. (AR 6575.) This provision is intended to ensure that all mitigation lands are purchased and set aside before the site is fully developed and before the remaining fees have been set and collected.

### D. The Permit

On February 21, 2002, the Service issued a permit to the Association for development of the Metro site. (AR 7173.) The permit is conditioned upon compliance with, and implementation of, the Plan and the Agreement. (AR 7174.) The permit runs for a maximum of 50 years but lasts only as long as the Association is in existence. (*Id.*)

---

**6.** The Plan originally set the per-acre fee at $5,993. (AR 6043.) The fee was increased by the Conservancy in 2003 to its present level. (Defs.' Mot. at 26 n. 21.) Of the original fee,

$3,000 was allocated for land acquisition, with the remainder going to various administrative and maintenance costs. (AR 6043.)

### E. Procedural History

The Service issued Findings and Recommendations and a Record of Decision on February 21, 2002, concluding that the implementation of the Plan would not jeopardize the continued existence of the snake, the hawk, or the other covered species. (AR 7124–71.) The Service found that: (1) any "take" of the covered species would be incidental to otherwise lawful activities, (2) the Plan minimized and mitigated the impacts of take to the maximum extent practicable, (3) the applicant ensured adequate funding, and (4) the authorized take would not appreciably reduce the likelihood of the survival and recovery of the species in the wild. (AR 7137–7144.) The permit was issued the same day. (AR 7172–78.) The plaintiffs challenge the issuance of the permit in their complaint filed February 13, 2003.

### II. Analysis

The plaintiffs [7] claim that the Service's issuance of the permit is arbitrary and capricious. They argue that: (1) there is inadequate evidence to find that the authorized take will not jeopardize the survival and recovery of the species; (2) the Plan does not ensure sufficient funding; and (3) there is no demonstration that the Plan mitigates to the "maximum extent practicable." As will become apparent, the case largely turns on the uncontested fact that the Metro site now provides only poor habitat for both the snake and the hawk.

### A. Statutory Framework

The Endangered Species Act requires the Secretary to determine whether a given species qualifies for protection as endangered or threatened, and confers significant protection on species that are so listed. Section 9 of the Act makes it unlawful for any person subject to the jurisdiction of the United States to "take" any member of any endangered or threatened species. See 16 U.S.C. § 1538(a)(1). The Act defines "take" as "to harass, harm, pursue, hunt, wound, kill, trap, capture, or collect." 16 U.S.C. § 1532(19). "Harm" is further defined by regulation to include killing or injuring a protected species through "significant habitat modification or degradation" that impairs "essential behavioral patterns, including breeding, feeding, or sheltering." 50 C.F.R. § 17.3.

Section 9's broad prohibition on taking is limited by several exceptions identified in § 10. Most importantly for present purposes, § 10 allows the Secretary to issue an incidental take permit, which authorizes its holder to take some members of protected species when the taking is incidental to carrying out an otherwise lawful activity. See 16 U.S.C. § 1539(a). The permittee is not liable for any taking that falls within the scope of the permit.

To obtain a permit, an applicant must develop and submit a habitat conservation plan, which specifies (1) the likely impact to the species from the proposed takings; (2) the steps the applicant will take to minimize and mitigate such impacts and the funding available for such mitigation; (3) alternative actions considered, and the reasons for not selecting them; and (4) such other measures as the Secretary may require as necessary or appropriate for the purposes of the plan. See 16 U.S.C. § 1539(a)(2)(A). Upon submission of a

---

7. The defendants have not challenged the plaintiffs' standing in this case. Members of the plaintiff organizations have presented affidavits substantially similar to those presented to the court in Babbitt, 128 F.Supp.2d at 1289–90. Those affidavits show that the plaintiffs meet the requirements of associational standing. Plaintiffs also meet the constitutional case or controversy requirement. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)

permit application and related conservation plan, "the Secretary shall issue the permit," if she finds, after opportunity for public comment, that (i) the taking will be incidental; (ii) the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking; (iii) the applicant will ensure that adequate funding for the plan will be provided; (iv) the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild; and (v) other measures required by the Secretary will be met. 16 U.S.C. § 1539(a)(2)(B). The permit "shall contain such terms and conditions as the Secretary deems necessary or appropriate to carry out the purposes of this paragraph." *Id.* If the Secretary finds that a permittee is not complying with the terms and conditions of the permit, she must revoke the permit. 16 U.S.C. § 1539(a)(2)(C).

### B. Will the Authorized Take Jeopardize the Survival and Recovery of the Species?

The plaintiffs argue that the Service's decision to issue the permit was arbitrary and capricious because the Service failed to demonstrate that the take authorized by the permit will not jeopardize the covered species. (Pls.' Mot. at 26–31.) Plaintiffs contend that the Service did not have the necessary information to make a no jeopardy finding because the mitigation land to be purchased under the Plan has not been identified. Plaintiffs also make a number of arguments based on the effects of the Plan on individual snakes living at the site.

#### 1. Failure to Identify Mitigation Lands

■ The Act requires the Service to find that "the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild." 16 U.S.C. § 1539(a)(2)(B)(iv). The Service did make such a finding; however, plaintiffs contend that such a finding could have no basis in fact because no mitigation lands have been identified. (Pls.' Mot. at 27–28.) They argue that without the identification of specific mitigation lands the value of these lands as habitat to the covered species is unknown and unknowable.

The Metro Plan incorporates detailed land acquisition criteria. It also requires that the acquired land be managed for the benefit of the covered species and describes how that will be accomplished. The Service found that the current habitat value of the Metro site is quite limited, a finding that the plaintiffs do not contest.[8] (AR 7090–96, 7136.) Under the Plan approximately 2000 acres of poor habitat will be exchanged for 1000 acres of conservation lands specifically managed to foster habitat for both the snake and hawk. The Service could rationally conclude that the Plan's acquisition criteria and management scheme ensure that mitigation land will provide habitat superior to that lost at the site and that far from jeopardizing the species, the Plan will enhance their prospects for survival.[9]

---

8. This finding distinguishes this case from *Babbitt,* 128 F.Supp.2d at 1298. In *Babbitt,* the Natomas Basin Plan failed to assess the value of the habitat on land within the development area. That Plan improperly assumed that all land in the Basin was of equal habitat value, although only some of the land was subject to the permit.

9. Plaintiffs also argue that *Sierra Club v. Marsh,* 816 F.2d 1376, 1389 (9th Cir.1987), requires that all mitigation lands must be purchased prior to issuing a permit conditioned upon mitigation through habitat acquisition. However, the holding of *Sierra Club* is based on the particular facts of that case, especially the critical nature of the habitat involved, a factor that is missing here. The Ninth Circuit has held that *Sierra Club* does not generally require the purchase of mitigation lands before issuance of a permit. *See Southwest Ctr. for Biological Diversity v. U.S. Bureau of Reclamation,* 143 F.3d 515, 523–24 (9th Cir.1998). There is no general rule re-

### 2. The Survival of Individual Snakes

Plaintiffs argue that the Plan fails to ensure the survival of individual snakes that may currently be living on the Metro site. (Pls.' Mot. at 28–30.) However, a habitat conservation plan need not demonstrate the survival of individual members of a covered species. Rather, the successful plan must ensure the continued viability of covered species, and the Service concluded that the Metro Plan does just that. The Service's conclusion is not arbitrary because certain individual snakes may be harmed by development on the site. The very purpose of the permit provisions of the Act is to allow the take of individual members of a species that the Act would otherwise prohibit.

### C. Does the Plan Adequately Ensure Funding?

 To obtain a permit, an applicant must "ensure that adequate funding for the plan will be provided." 16 U.S.C. § 1539(a)(2)(B)(iii). Plaintiffs argue that the Association has not ensured adequate funding of the Metro Plan. (Pls.' Mot. at 23–26.) There are a number of provisions of the Plan intended to ensure the adequacy of its funding. Most important are the provisions of the CC & Rs that give the Association the authority to impose any necessary supplemental fees on already-developed parcels—such that the first developers may yet be liable for an additional assessment if future land costs soar—and the provisions of the Agreement that require the Association to impose supplemental fees if necessary to fully implement the Plan. The mid-point review and requirement that all mitigation lands be purchased before the final 10% of the Plan site is developed provide some additional assurances. However, plaintiffs argue that these provisions are inadequate because the property owners could simply dissolve the Association rather than impose additional fees upon themselves. (Pls.' Reply at 11–15.) Plaintiffs imagine a scenario in which land costs rise steeply, most of the area is developed quickly under a fee that is too low to pay for conservation lands, and it is necessary to reach back to earlier developers for supplemental fees. Plaintiffs contend that developers will simply dissolve the Association rather than pay the additional fees.

In addition to being speculative, plaintiffs' argument also fails to recognize that dissolution of the Association would be unlawful under the terms of the permit. As a matter of state corporate law, the Association, a California corporation, has the ability to dissolve. But the CC & Rs provide that "no provision... relating to the [Plan] and the [permit]... may be modified, revoked or terminated without prior written consent of the [Service] and the [California Department of Fish and Game]." (AR 17105.) Dissolution of the Association would require the revocation of all, or at least most, of the CC & Rs, including many related to the Plan. Therefore, dissolution would require the permission of both the federal and state agencies. Dissolution of the Association would also be a violation of the Agreement, in which the Association obligated itself to fully carry out the Plan's conservation measures.

Moreover, the permit allows incidental take conditioned upon compliance with, and implementation of, the Plan. Thus, the permit gives the property owners certain rights (to take covered species) but also imposes certain duties (to fully implement the Plan). These duties do not end with the payment of the initial mitigation fee or with the acquisition of mitigation land. For instance, wetlands must be continually managed as either rice fields or marsh,

quiring purchase of mitigation lands prior to the issuance of a permit under the Act.

both of which require seasonal flooding and draining. (AR 6097.) Management of the wetlands also requires periodic removal of exotic pest plants. (AR 6099.) The Plan also requires the monitoring of trees planted to provide Swainson's Hawk habitat, with replanting if necessary. (AR 6054.) If the developers dissolve the Association, and this leads to a failure to fully implement the Plan, then their actions violate the permit. The Act permits the government to pursue civil and criminal penalties against "any person who knowingly violates... any provision of any" incidental take permit.[10] 16 U.S.C. § 1540(a)(1), (b)(1). The developers would be subject to these penalties if they dissolved the Association in order to avoid assessments necessary to implement the Plan.

### D. Does the Plan Mitigate to the Maximum Extent Practicable?

To issue an incidental take permit, the Service must find that the habitat conservation plan minimizes and mitigates the impacts of incidental take "to the maximum extent practicable." 16 U.S.C. § 1539(a)(2)(B)(ii). The term "maximum extent practicable" is not defined in the statute, nor in any formal agency regulations.[11] It joins together two somewhat opposing concepts, "maximum" and "practicable,"[12] without providing the key to their reconciliation. Plaintiffs seem to argue that, in a plan designed like this one, where the development of land on-site is mitigated through the purchase and set-aside of land off-site, the maximum extent practicable requirement means that the plan must require the purchase of as much mitigation land as the particular developer possibly could afford while still going forward with the development. The environmentally superior alternative for the species would always be the preservation or creation of as much habitat as possible before the project would be rejected by a developer as too expensive. The Service, however, does not approach the maximum extent practicable requirement in this way. Rather, the Service looks to whether the

10. There is no indication in the statute that only parties to the permit are subject to these penalties—the use of "any person" indicates just the opposite. Therefore, the fact that the developers are not parties to the permit is not relevant. So long as they "knowingly" violate the terms of the permit they may be liable.

11. The Service's Habitat Conservation Planning Handbook does contain a definition of "maximum extent practicable." *See* Habitat Conservation Planning Handbook at 7–3,4. The Handbook provides that the maximum extent practicable finding "typically requires consideration of two factors: adequacy of the minimization and mitigation program, and whether it is the maximum that can be practically implemented by the applicant." *Id.* That definition basically resembles the approach taken by the Service in its Findings and Recommendations in this case. (*See* AR 7140.)

12. The parties do not explicitly consider the meaning of the term "practicable." The implication in the plaintiffs' briefs is that "maxi-

mum extent practicable" means the most that can possibly be done—in other words, the most the developers could pay while still going forward with the project. While the meaning of the term "practicable" in the statute is not entirely clear, the term does not simply equate to "possible." "Practicable" is often used in the law to mean something along the lines of "reasonably capable of being accomplished." *Black's Law Dictionary* (7th ed.1999). For example, "practicable" is defined in a Federal Highway Administration regulation as "capable of being done within reasonable natural, social, or economic constraints." 23 C.F.R. § 650.105(k). "Practicable" is used twice in Fed.R.Civ.P. 23 and neither time is it synonymous with "possible." Courts also universally interpret the phrase "as soon as practicable," which is common in insurance policies, to mean "within a reasonable time." *See, e.g., Ormet Primary Aluminum Corp. v. Employers Ins. of Wausau,* 88 Ohio St.3d 292, 725 N.E.2d 646, 655 (2000).

mitigation is "rationally related to the level of take under the plan." (AR 7140.)

■ The statutory language is consistent with the Service's interpretation. The statute requires that "the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of" its take. 16 U.S.C. § 1539(a)(2)(B)(ii). The words "maximum extent practicable" signify that the applicant may do something less than fully minimize and mitigate the impacts of the take where to do more would not be practicable. Moreover, the statutory language does not suggest that an applicant must ever do more than mitigate the effect of its take of species. Thus, if a permit authorized the destruction of one acre of habitat that normally supports one individual member of a protected species, it would not be necessary for the applicant to create 100 acres of new habitat that would support some 100 individuals of the species, even if the particular developer could afford to do so. The Service's construction of the statute is entitled to deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).[13] Because the phrase "maximum extent practicable" is at best ambiguous, the court will defer to the construction of the agency, so long as it is reasonable. *Id.* at 844, 104 S.Ct. 2778. The Service's view of the statutory language as requiring that the level of mitigation must be "rationally related to the level of take under the plan" is entirely reasonable and avoids absurd results.[14] It also avoids unduly enmeshing the Service in developers' economic affairs and projections.

Using this construction of the statute, the Service made a finding that "the level of mitigation provided for in the [Plan] more than compensates for the impacts of take that will occur under the plan."[15] (AR 7140.) Based on such a finding, the Service was under no obligation to inquire whether additional mitigation was finan-

**13.** The court recognizes that there is uncertainty about when agency interpretations receive *Chevron* deference. *See* Richard Pierce, *Administrative Law Treatise* § 3.5 (4th ed.2004 supp.). Formal agency rules announced after notice and comment clearly do receive full deference, while more informal agency determinations may not. *See United States v. Mead Corp.*, 533 U.S. 218, 230, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (holding that a statutory construction in a Customs letter received no deference). The court is persuaded that *Chevron* deference is appropriate in this instance given the "interstitial nature" of this legal question, the importance of the meaning of "maximum extent practicable" to the administration of the permit scheme, and the "expertise" of the Service. *See Barnhart v. Walton*, 535 U.S. 212, 222, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002).

**14.** Under plaintiffs' interpretation, a permit that allows disturbance of one acre of Giant Garter Snake habitat could require the developer to create and manage one thousand acres of replacement habitat if that was the maximum the developer could afford.

**15.** Plaintiffs argue that other evidence shows that the agency's conclusion that the Plan mitigated to the maximum extent practicable is arbitrary and capricious. They cite a number of internal documents from Service biologists questioning the adequacy of the mitigation ratio. (Pls.' Mot. at 17–18.) However, the mere existence of internal disagreements between agency experts does not make the agency's decision arbitrary or capricious. *Aluminum Co. of Am. v. Bonneville Power Admin.*, 175 F.3d 1156, 1161–62 (9th Cir.1999). Plaintiffs also argue that the 0.5:1 ratio in the Metro Plan is significantly lower than that required by other plans in the region. (Pls.' Mot. at 19–20.) These plans, however, deal with additional species and use very different methods for calculating the mitigation ratio. (*See, e.g.*, San Joaquin County Plan 4.1.2.) Their use of higher ratios is not determinative of what is adequate or practicable in the Metro Plan, particularly given that the development lands currently provide little or no habitat of value.

cially possible. All that was reasonably required to mitigate had been included in the Plan.[16]

Even accepting plaintiffs' contention that the statute requires mitigation up to the financial breaking point, there is sufficient evidence here from which to draw that conclusion. The Service had evidence that the total development fees for the Metro Air Park project are among the highest in the Sacramento region, so the imposition of the higher fees necessary to purchase more habitat would make the project uncompetitive with other development in the area. (AR 7140.) The developers are also exposed to liability for supplemental fees should those prove necessary. This evidence is adequate to support the Service's conclusion that higher mitigation fees are impracticable, given that the existing lands are of little value and that mitigation fully compensates for any taking.

### III. Conclusion

The Fish and Wildlife Service made all of the proper statutory findings before issuing the incidental take permit for the Metro Air Park development. The Service's ultimate conclusion that the mitigation measures included in the Metro Air Park Habitat Conservation Plan would benefit the Giant Garter Snake and the Swainson's Hawk, along with the other covered species, is reasonable given the degraded nature and poor quality of the habitat on the development site. The Service's decision to issue the permit is not arbitrary and capricious. Therefore, plaintiffs' motion for summary judgment is

DENIED; defendants' cross-motion for summary judgment is GRANTED.

IT IS SO ORDERED.

---

16. Plaintiffs argue that the Service had to consider an increased mitigation alternative in order to make a finding that further mitigation measures were not practicable. It is true that consideration of a higher mitigation alternative will often be useful to the Service when determining whether additional mitigation is practicable. *See Babbitt,* 128 F.Supp.2d at 1292; HCP Handbook at 7–3. However, in the Metro Plan, increased mitigation would mean the purchase of more land for habitat. Since the Service found that the mitigation provided "more than compensates" for the impact of take, it was not necessary to consider alternatives that would do even more.