Opinion for the Court filed by Senior Circuit Judge GINSBURG.
Dissenting opinion filed by Circuit Judge ROGERS.
GINSBURG, Senior Circuit Judge:
The Secretary of the Interior appeals the district court’s grant of summary judgment to the Friends of Blackwater et al. The district court held the Fish and Wildlife Service, an agency in the Department of the Interior, violated the Endangered Species Act by removing the West Virginia Northern Flying Squirrel from the list of endangered species when several criteria in the agency’s Recovery Plan for the species had not been satisfied. We hold the district court erred by interpreting the Recovery Plan as binding the Secretary in his delisting decision. Because we also reject the Friends’ alternative arguments that the Service’s action was arbitrary, capricious, and contrary to law, we reverse the judgment of the district court.
*430 I.
Background
[[Image here]]
The West Virginia Northern Flying Squirrel (Glaucomys sabrinus fuscus) is one of 25 distinct subspecies of the Northern Flying Squirrel. It is a “small, nocturnal, gliding mammal[]” with a “long, broad, flattened tail ..., prominent eyes, and dense, silky fur” that lives in West Virginia and Virginia. U.S. Fish and Wildlife Service, Appalachian Northern Flying Squirrels Recovery Plan 1-3 (Sept. 24, 1990). Despite its name, the flying squirrel cannot fly; but the patagia, or folds of skin, that stretch between its arms and legs allow it to glide for a distance when it leaps from a tree branch. Historically, its habitat consisted of the spruce-fir and northern hardwood forests of the southern Appalachian Mountains. Id. at 2, 6. In 1985, when scientists had documentéd only ten living squirrels, the Fish and Wildlife Service concluded it was endangered * and suggested that, although the squirrels’ population “may have been declining since the Pleistocene, ... [t]heir decline ha[d] probably been accelerated through clearing of forests and other disturbances by people.” 50 Fed.Reg. 26,999, 26,999 (July 1,1985).
As required by § 4(f) of the Endangered Species Act, 16 U.S.C. § 1533(f), the Service created a recovery plan for the “conservation and survival” of the squirrel,* *431 enumerating the following “criteria which, when met, would result in a determination ... that the species be removed from the list” of endangered species, id. § 1533(f)(l)(B)(ii):
1. [SJquirrel populations are stable or expanding ... in a minimum of 80% of all Geographic Recovery Areas [GRAs] designated for the subspecies,
2. [S]uffieient ecological data and timber management data have been accumulated to assure future protection and management ...
3. GRAs are managed in perpetuity to ensure: (a) sufficient habitat ... and (b) habitat corridors ... [and]
4. [T]he existence of the high elevation forests on which the squirrels depend is not itself threatened by introduced pests ... or by environmental pollutants....
Recovery Plan at 18.
In 2002, the Service hired a biologist to investigate the possibility of removing the squirrel from the list of endangered species, and the next year began to draft its five-year review of the squirrel’s status. In the review, published in 2006, the Service concluded the Recovery Plan, which had been created in 1990, “d[id] not have up to date recovery criteria,” and the squirrel did “not meet the definition of endangered or threatened” because it “persisted] throughout its historic range.” U.S. Fish and Wildlife Service, West Virginia Northern Flying Squirrel 5-Year Review: Summary and Evaluation 5, 20 (April 2006). Whereas only ten squirrels had been sighted at the time of the original listing in 1985, by 2006 scientists had captured 1,063 individual squirrels at 107 sites, id. at 7, which suggested to the Secretary the population was robust, see U.S. Fish and Wildlife Service, Analysis of Recovery Plan Criteria for the West Virginia Northern Flying Squirrel 3 (Dec. 18, 2007).
Later in 2006 the Service proposed to remove the squirrel from the list of endangered species. See 71 Fed.Reg. 75,924 (Dec. 19, 2006). The agency explained the squirrel no longer faced any of the threats listed in § 4(a)(1) of the Act so as to warrant its continued designation as either endangered or threatened. Id. at 75,925-29. With regard to the 1990 Recovery Plan, it said that because the “recovery criteria do not specifically address the five threat factors used for ... delisting a species,” the plan “does not provide an explicit reference point for determining the appropriate legal status of’ the squirrel. Id. at 75,925. In any event, such plans “are not regulatory documents and are instead intended to provide guidance to the Service, States, and other partners on methods of minimizing threats to listed species and on criteria that may be used to determine when recovery is achieved.” Id. at 75,924-25. The Service emphasized its view that delisting the squirrel was appropriate because, among other things, “long-term nest box monitoring data provide[d] strong evidence of [its] continued presence throughout its range,” id. at 75,926, and “habitat trends [were] moving in a positive direction in terms of forest regeneration and conservation,” id. at 75,927.
Various scientists and conservation groups filed comments criticizing the Service’s use of “persistence,” which it defined as “continuing captures of [a species or subspecies] over multiple generations at previously documented sites throughout the historical range,” 73 Fed.Reg. 50,226, 50,227 (Aug. 26, 2008) (“Delisting Rule”), to gauge the squirrel’s recovery; the measure could not provide estimates of population levels or trends and, they pointed out, persistence so defined could not *432 rule out the possibility the squirrel’s population was declining.
In its final rule delisting the squirrel the Service responded to these comments as follows: The data showing persistence across 80 percent of the squirrel’s historic range were simply “not indicative of a declining population.” Id. at 50,227. Data for the remaining 20 percent need not indicate a lack of persistence because the squirrels are “elusive and hard to capture.” Id.
The Friends of Blackwater filed a complaint in the district court claiming (1) promulgation of the Delisting Rule violated the Endangered Species Act by ignoring the objective, measurable criteria in the Recovery Plan and (2) the Rule itself was arbitrary and capricious because it was not based upon the best available science. The district court entered summary judgment for the plaintiff, Friends of Blackwater v. Salazar, 772 F.Supp.2d 232 (D.D.C. 2011), on the ground the Service was bound by the criteria in the Recovery Plan and its decision to delist the squirrel without following those criteria therefore constituted a revision to that plan, made without going through notice and comment rulemaking as required by the Act, id. at 241-42. In a footnote, the court also directed the agency on remand to modify its analysis of the statutory factors relevant to delisting “to the extent the agency’s decision [to delist] was based on an analysis that did not separately assess the adequacy of existing regulatory mechanisms,” as required by § 4(a)(1)(D) of the Act. Id. at 245 n. 17. The district court vacated the Delisting Rule, id. at 245, and the Service appealed to this court.
II. Analysis
In a case like the present one, “where the district court was reviewing an agency rulemaking under the Administrative Procedure Act ... we review the administrative record directly.” Troy Corp. v. Browner, 120 F.3d 277, 281 (D.C.Cir. 1997) (internal quotation marks and citation omitted). We review the Secretary’s interpretation of the statute under the familiar two-step framework from Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). At Step One, the court asks “if the statute unambiguously forecloses the agency’s interpretation,” Nat’l Cable & Telecomms. Ass’n v. FCC, 567 F.3d 659, 663 (D.C.Cir.2009); if it does not, then at Step Two “we defer to the administering agency’s interpretation as long as it reflects ‘a permissible construction of the statute,’ ” Sherley v. Sebelius, 644 F.3d 388, 393 (D.C.Cir.2011) (quoting Chevron, 467 U.S. at 843, 104 S.Ct. 2778).
A. The Legal Effect of the Recovery Plan
The Friends claim the statutory requirement that for each endangered species the Service draft a recovery plan with “objective, measurable criteria” unambiguously means those criteria must be met before a species may be delisted. In response, the Service argues the criteria in the Recovery Plan, unlike the factors in § 4(a)(1) of the Act, are not binding upon the agency in deciding whether a species is no longer endangered and therefore should be delisted.
■ To resolve this dispute, we “begin! ] with the words of the statute.” Pharm. Research & Mfrs. of Am. v. Thompson, 251 F.3d 219, 224 (D.C.Cir. 2001). Section 4(a)(1) of the Act provides the Secretary “shall” consider the five statutory factors when determining whether a species is endangered, and § 4(c) makes clear that a decision to delist “shall be made in accordance” with the same five factors. 16 U.S.C. § 1533(a), (c). Although § 4(f) states the Secretary “shall *433 develop and implement” a recovery plan and “shall ... incorporate in [the recovery] plan ... objective, measurable criteria,” id. § 1533(f), the Act does not similarly say the Secretary “shall” consult those criteria in making a delisting decision. Rather, § 4(f)(l)(B)(ii) states simply that the criteria in the recovery plan should be those “which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list.” This provision is ambiguous in a relevant respect: It can be read, as the Friends suggest, to place a binding constraint upon the Secretary’s delisting analysis, but it can also be read as the Secretary suggests, based in part upon the absence of the word “shall,” to indicate the “objective, measureable criteria” are predictive of the Service’s delisting analysis rather than controlling that analysis. See Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (“Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion” (internal quotation marks and alteration omitted)). On the Secretary’s reading, the criteria would serve as proxies, tailored to what is known about the particular species, standing in for the statutory factors of § 4(a)(1) that ultimately control the Secretary’s delisting decisions for all species.* The ambiguity is magnified because § 4(f) of the Endangered Species Act qualifies the Secretary’s duty to incorporate “objective, measurable criteria” in “developing and implementing recovery plans” with the phrase “to the maximum extent practicable.” 16 U.S.C. § 1533(f). Cf. Oceana, Inc. v. Locke, 670 F.3d 1238, 1242-43 (D.C.Cir.2011) (reading statutory provision as mandatory where, in contrast to a neighboring provision, duty imposed was not modified by phrase “to the extent practicable”); Biodiversity Legal Found, v. Babbitt, 146 F.3d 1249, 1253-54 (10th Cir.1998) (phrase “to the maximum extent practicable” in § 4(b)(3)(A) of Endangered Species Act indicates non-mandatory character of provision).
Other “traditional tools of statutory construction,” Chevron, 467 U.S. at 843 n. 9, 104 S.Ct. 2778, do not reveal any more clearly the intent of the Congress on this question. The Friends argue the legislative history indicates the criteria in the recovery plan must be binding because the Congress added the call for “objective, measureable criteria” specifically in order to “improve the development, implementation and review of plans for the recovery of listed species.” S.Rep. No. 100-240 (1987), reprinted in 1988 U.S.C.C.A.N. 2700, 2700. The Friends also argue the structure of the Act confirms their view because the Secretary’s interpretation would render the requirement of “objective, measurable criteria” meaningless.
These arguments from legislative history and structure come down to the single claim that interpreting the Recovery Plan as non-binding would render § 4(f) of the Act a nullity. That is not correct. With an exception not relevant here, § 4(f) obliges the Secretary to “develop and implement plans” for the recovery of any species designated as endangered. 16 U.S.C. § 1533(f)(1). If the Secretary wants to change the plan, then he first must let the public comment. Id. § 1533(f)(4). It does not follow, however, that with each criterion he includes in a *434 recovery plan the Secretary places a further obligation upon the Service. A plan is a statement of intention, not a contract. If the plan is overtaken by events, then there is no need to change the plan; it may simply be irrelevant. If someone said he would see me in Cleveland while on his way to Chicago and would let me know before changing his plan, it would hardly be sensible to say he must “revise” his plan before he can tell me that he no longer needs to make the trip.
Nor is there anything unusual about a statute that requires an agency to publish a non-binding document. See Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 69, 72, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004) (statute required BLM to promulgate land use plan, but plan itself was “designed to guide” BLM, not to be legally enforceable). Contrary to the Friends’ argument, the Secretary’s interpretation of the plan as non-binding does not render meaningless the Secretary’s statutory obligations to create and to implement a recovery plan and to use notice and comment in order to revise such a plan. On the contrary, a recovery plan, even if not binding, so long as the species is endangered provides “objective, measurable criteria” by which to evaluate the Service’s progress toward its goal of conserving the species.
It is a short hop from here to conclude under Step Two of Chevron that the Secretary’s interpretation is a “permissible” one. The Service fairly analogizes a recovery plan to a map or a set of directions that provides objective and measurable steps to guide a traveler to his destination. Cf. Fund for Animals, Inc. v. Rice, 85 F.3d 535, 547 (11th Cir.1996) (holding “recovery plans are for guidance purposes only”). Although a map may help a traveler chart his course, it is the sign at the end of the road, here the five statutory factors indicating recovery, and not a mark on the map that tells him his journey is over. Moreover, as with a map, it is possible to reach one’s destination — recovery of the species — by a pathway neither contemplated by the traveler setting out nor indicated on the map.
B. The Measure of “Persistence”
The Friends of Blackwater contend in the alternative the Service (1), by using data on the species’ “persistence” rather than data on its population and population trends, violated the statutory requirement that it use the “best ... data available,” 16 U.S.C. § 1533(b)(1)(A), and (2), by failing adequately to explain its departure from the population-based criterion in the Recovery Plan, rendered its decision arbitrary and capricious within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), see Motor Vehicle Mfrs. Ass’n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).*
The Friends’ first argument runs afoul of Southwest Center for Biological Diversity v. Babbitt, in which we explained *435 that under the “best ... data available” standard, “the Secretary has no obligation to conduct independent studies”; the Service is entitled to rely upon the best data available to it, which in that case were existing scientific estimates of the species’ population, rather than conducting its own population count in order to determine whether a species is endangered. 215 F.3d 58, 60-61 (D.C.Cir.2000). In this case, where it is undisputed the “best ... data available” related to the persistence of the species, the Service was entitled to rely upon those data in its delisting analysis, just as it was entitled to list the squirrel in the first place even though no estimate of the squirrel’s population was then available. See id. (requirement of best data available “merely prohibits the Secretary from disregarding available scientific evidence that is in some way better than the evidence he relies on” (internal quotation marks and citation omitted)). Moreover, the Service reasonably determined the data on persistence, which showed the squirrel “persisted] throughout its historic range,” 5-Year Review at 20, were “not indicative of a declining population,” 73 Fed.Reg. at 50,227; hence it could reasonably find the species’ survival was no longer threatened by loss of habitat.
This would end the matter were it not for the Service’s statement in the Recovery Plan that it would look to estimates of population trends. See Recovery Plan at 18 (saying it could delist the squirrel when “squirrel populations are stable or expanding” in at least 80 percent of certain designated areas). Although, as we explained above, that plan was not binding upon the agency, the Friends maintain the Service had an obligation adequately to account for any departures from the guidelines described in the plan, citing Motor Vehicle Mfrs. Ass’n, 463 U.S. at 42, 103 S.Ct. 2856 (“an agency changing its course ... [must] supply a reasoned analysis”). Whether an agency must account for a departure from a prior non-binding statement of intent is not entirely clear. Compare Sitka Sound Seafoods, Inc. v. NLRB, 206 F.3d 1175, 1182 (D.C.Cir.2000) (“Manual does not bind the Board ... [and so] the relevant question is whether, quite apart from the Manual, the Board acted unreasonably”), with Edison Elec. Institute v. EPA, 391 F.3d 1267, 1269 & n. 3 (D.C.Cir.2004) (“[report] is not strictly binding upon EPA and any deviation from the Report is not per se arbitrary and capricious”; “real question is whether EPA adequately accounted for any departures” from factors described in report). We need not resolve this question today because the Service adequately explained that population data were not available whereas data on persistence were. Still, the Friends contend the Service’s stated reason for not itself estimating the population, viz., the cost and difficulty of doing so, fails because the Service knew of the difficulty of estimating the squirrel population when it adopted the population criterion in the Recovery Plan. See Recovery Plan at 11 (noting the squirrels were “extremely difficult to collect and study”).
Though not illogical, neither does the Friends’ argument show the Service was arbitrary and capricious. The agency did realize when it put the population-based criterion into the Recovery Plan in 1990 that the squirrels were difficult to monitor. After more than 15 years of gathering more data and capturing more squirrels, however, the Service could reasonably conclude, and the Friends do not dispute, that “[a]n adequate monitoring scheme to estimate population numbers across a representative sample of the entire range of the [squirrel] would require many thousands of nest boxes and traps,” Analysis of Recovery Plan Criteria at 1. The Friends have not shown the Service’s judgment that a project of that magnitude was simply too difficult and too costly for ■ the *436 agency to undertake was arbitrary and capricious. Therefore, we conclude the Service has met any burden it may have to account for its departure from the criterion it contemplated when it developed the Recovery Plan in 1990.
C. Inadequacy of Regulatory Mechanisms
Finally, the Friends argue the Service failed to conduct an independent analysis of the fourth statutory factor, “the inadequacy of existing regulatory mechanisms,” 16 U.S.C. § 1538(a)(1)(D), which factor they claim must be analyzed without regard to whether there are any threats arising under the other provisions of § 4(a)(1). The Service did consider the adequacy of existing regulatory mechanisms, but it did not do so in isolation. On the contrary, having considered all the other types of threats listed in § 4(a)(1) and found no existing conditions such as disease or destruction of habitat threatened the subspecies, the Service could reasonably, indeed readily, conclude the squirrel did not require additional regulatory protection. See Delisting Rule, 73 Fed.Reg. at 50,237.
Under the Friends’ approach to § 4(a)(1)(D), the Service would have to assess the adequacy of regulatory mechanisms without regard to its analysis of the threats listed in clauses A, B, C, and E of the same section. This contention is most peculiar. If the adequacy or “inadequacy of existing regulation]” is to be judged without considering the level, or even the existence, of any threat the regulation is designed to meet, then it would follow that the Service could never delist a species unless some regulatory mechanism was in place to protect it — whether needed or not. Moreover, because the Service is to apply the same factors to listing as to delisting decisions, 16 U.S.C. § 1533(c), it would follow that every species (except pests, see id. § 1532(6)) must either (1) be protected by regulations of some sort or (2) be classified as endangered or threatened. Absent compelling evidence, we will not attribute to the Congress the intent to create such an absurd overabundance of regulation— and a further abundance of, for example, white-tailed deer, which have long since moved into metropolitan areas in search of better forage and fewer predators, including hunters. See Steeve D. Côté et al., Ecological Impacts of Deer Overabundance, 35 Ann. Rev. Ecology Evolution & Systematics 113, 116 (2004); Robert K. Swihart et al., Ecology of Urban and Suburban White-Tailed Deer, in Urban Deer-. A Manageable Resource? 35, 35, 42 (Jay B. McAninch ed.1993). By considering the adequacy or inadequacy of regulations in light of other threats to the species, the Secretary’s interpretation of § 4(a)(1)(D) is certainly reasonable, and the Friends therefore have failed to demonstrate the Service violated the Act by acting upon that interpretation.
III. Conclusion
We hold the Secretary reasonably interpreted the Endangered Species Act as not requiring that the criteria in a recovery plan be satisfied before a species may be delisted pursuant to the factors in the Act itself. Because the Secretary’s determination the West Virginia Northern Flying Squirrel was no longer endangered was neither arbitrary and capricious nor in violation of the Act, the judgment of the district court is

Reversed.

Appendix: Notes on the Dissent
Our dissenting colleague labors at length to prove “shall” indicates an action is mandatory and “to implement” means to give practical effect, see Dissent at 441-42, two points we nowhere dispute. Nor do we doubt § 4(f)(1) of the Act imposes man *437 datory obligations upon the Secretary. The Secretary shall, for example, develop a recovery plan for an endangered species, 16 U.S.C. § 1533(f)(1), which plan shall include “objective, measurable criteria,” id. § 1533(f)(l)(B)(ii). The Secretary, moreover, must implement the plan. Id. § 1533(f)(1). That is, as long as a species is listed as endangered, the agency is obligated to work toward the goals set in its recovery plan. None of this, however, implies the objective, measurable criteria in the plan limit the agency when it is deciding whether to delist a species.
The foregoing interpretation of § 4(f)(1) does not render the notice and comment requirement of § 4(f)(4) “superfluous.” Cf. Dissent at 445. If the Service believes the goals in the recovery plan for a species are outdated but the species is still endangered, then the Secretary must either continue to pursue those goals or, more sensibly, update the plan, which requires notice and comment.
The dissent’s claim (at 442) that our interpretation “erases ‘(f)(1)’ from ‘(f)(l)(B)(ii)’ ” ignores our reading of those provisions (at 443) as together indicating the Secretary “shall ... incorporate in [the recovery] plan ... objective, measurable criteria.” Accordingly, we agree with the dissent to the extent that subsection (B)(ii) imposes upon the Secretary a mandatory duty to incorporate criteria in a recovery plan but, the dissent’s insistence to the contrary notwithstanding, that understanding alone does not clarify how such criteria relate to the Secretary’s delisting decision. Our dissenting colleague correctly identifies (at 442) the “future conditional tense” in § 4(f)(l)(B)(ii), but misstates the logical relation in that statement, and thereby mistakenly reads the provision as unambiguous. As we note (at 444 n.*), the phrase “which, when met, would result” most plainly expresses a sufficient, not a necessary, condition: It says what must happen when the criteria are met, but is silent — and therefore ambiguous — with respect to what may or must happen when the criteria are not met. Although one could read the word “only” into the statute so that it states a necessary condition (“which, [only] when met, would result”), one can as well — as the Secretary’s interpretation suggests — read the conditional “would” as referring to the agency’s likely delisting analysis pursuant to the factors prescribed in § 4(a)(1). See Knight v. Comm’r, 552 U.S. 181, 192, 128 S.Ct. 782, 169 L.Ed.2d 652 (2008) (“In the context of making ... a prediction, ... the word ‘would’ is best read as expressing concepts such as ... probability” (internal quotation marks, alteration, and citation omitted)). Hence the ambiguity.
The “context and structure of the statute,” Dissent at 442, only underscore this ambiguity and therefore support our deferring under Chevron to the Secretary’s interpretation. Section 4(c) of the Act, which describes the Secretary’s delisting analysis, provides: “Each determination [that a species be delisted] shall be made in accordance with the provisions of subsections (a) and (b) of this section.” 16 U.S.C. § 1533(c). Section 4(c), however, makes no mention of subsection (f) or its requirement of a recovery plan. When the Congress amended the Act to add the requirement of “objective, measurable criteria,” see Pub.L. No. 100-478, 102 Stat. 2306 (1988), it could have, but did not, revise § 4(c) to require a delisting determination also be made in accordance with the recovery plan criteria adopted pursuant to § 4(f).*
*438 The dissent suggests (at 442^3) the legal effect of the qualifying phrase “to the maximum extent practicable,” 16 U.S.C. § 1533(f)(1), insofar as it applies to the Secretary’s duty to “incorporate in each plan ... objective, measurable criteria,” id. § 1533(f)(l)(B)(ii), runs out once the Secretary has included such criteria in a plan. The statute, however, applies this qualification to the Secretary’s actions both “in developing and [in] implementing recovery plans.” Id. § 1533(f)(1) (emphasis added). The dissent says “implementing” can have no reference to subsection (B) of § 4(f)(1) because “incorporating]” something in a plan occurs solely in the course of “developing” the plan, but we are not so quick to abandon the plain text of the statute. Although “implementing” has a more obvious connection to subsection (A), with respect to subsection (B) it at least tells us the Secretary must incorporate criteria that are practicable to implement. The dissent’s interpretation would have the Secretary measure the practicability of incorporating criteria in a recovery plan without respect to the practicability of their implementation, but that cannot be correct. If the practicability of incorporating criteria is to be determined without a view to the practicability of their implementation, then any imaginable criterion may be incorporated so long as the agency has the wit to place the requisite words upon a page. (Why not when the cow jumps over the moon? Or when Birnam Wood be come to Dunsinane?) Following a more reasonable interpretation, it would be “impracticable” for the Secretary to adopt criteria that by their nature could never be met and hence would preclude delisting a species so long as those criteria remain in effect. Similarly, if the Secretary foresees that adopting certain criteria would unduly restrict his delisting analysis, then he may decide it is practicable only to adopt criteria that guide but do not constrain that analysis.*
Our dissenting colleague next offers (at 444) her “flight plan” analogy in an effort to show certain administrative plans may not be “discarded” even if “overtaken by events,” but the analogy in fact supports our interpretation. As the dissent notes, a portion of the regulation regarding flight plans allows a pilot to deviate from a flight plan if “an emergency exists,” 14 C.F.R. *439 § 91.123(a), which the pilot may declare in his discretion, id. §§ 91.123(c), 91.3(b), but the dissent misses the significance of this exception. An emergency negates the need for a fixed flight plan much as the recovery of a species negates the need for a plan designed to bring about that recovery; in either event, the formal revision of such a plan would not be useful and therefore, unsurprisingly, is not required by law.
The dissent addresses (at 449-50) a facially plausible “logical outgrowth” argument that appears nowhere in the Friends’ brief, was not raised in the district court, and therefore is not properly before us. See United States v. Southerland, 486 F.3d 1355, 1360 (D.C.Cir.2007) (“argument ... raised for the first time at oral argument ... is forfeited”); Benoit v. Dep’t of Agric., 608 F.3d 17, 21 (D.C.Cir.2010) (argument not raised in district court is forfeited). As part of their argument that the statute unambiguously requires the Secretary either to meet the criteria in the recovery plan or to modify them through notice and comment prior to delisting, the Friends did argue the notice and comment process the Secretary used to delist the Squirrel did not constitute a revision of the recovery plan. See Br. of Appellees at 35-40. Because we rejected the Friends’ must-meet-or-modify premise, however, there is no need to address that dependent argument. In the Friends’ “alternative argument that the Secretary violated the Administrative Procedure Act,” Dissent at 448, they alleged the delisting process was arbitrary and capricious and not based upon the best data available, see Br. of Appellees at 45-51, not that the final rule was not a logical outgrowth of the proposed rule.
With respect to the Friends’ argument that the Act precludes the Secretary from relying upon data concerning persistence, the dissent suggests (at 450-61) the Secretary must have data on the population of a species before he may decide to delist it. What § 4(b)(1)(A) and § 4(c) of the statute require, however, is that the Secretary use the “best ... data available” when, respectively, listing or delisting a species. 16 U.S.C. § 1533(b)(1)(A), (c). Population data were not available when the Secretary listed the squirrel as endangered. Nor were such data available when he delisted the squirrel. To require the Secretary before acting to obtain such data as are not then “available” is clearly foreclosed by the statute. See id.; Am. Wildlands v. Kempthorne, 530 F.3d 991, 1001 (D.C.Cir.2008) (“in the absence of available evidence, Congress does not require the agency to conduct its own studies”).
The dissent compounds the error by claiming (at 451) data on persistence do not “answer the relevant question,” and asserts upon this basis the Secretary relied upon “no data.” Evidence is relevant to a particular question of fact if “it has any tendency to make [that] fact more or less probable.” Fed.R.Evid. 401(a). The question at issue here is whether the squirrel is an “endangered species,” which the Act defines as “any species which is in danger of extinction throughout all or a significant portion of its range.... ” 16 U.S.C. § 1532(6). Because extinction is less likely where there is widespread persistence than where there is not, persistence is relevant to a determination whether a species is endangered; and if the only data available concern persistence, then they are quite clearly the “best” data available. To be sure, data on persistence would also be relevant to the question of a species’ “survival,” see Dissent at 450, 451-52, a term with a meaning distinct from “recovery,” see 50 C.F.R. § 402.02 (defin *440 ing “[r]ecovery” as “improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in section 4(a)(1) of the Act”), but that is neither here nor there. Evidence may be relevant to two distinct legal questions, and therefore its relevance to a question not at issue (survival), does not imply or even suggest its irrelevance to the question that is at issue (recovery).

 Section 4(a)(1) of the Endangered Species Act states the "Secretary [of the Interior] shall” make a determination a species (or subspecies, see 16 U.S.C. § 1532(16)) is endangered "because of any of the following factors”:
(A) the present or threatened destruction, modification, or curtailment of its habitat or range;
(B) overutilization for commercial, recreational, scientific, or educational purposes;
(C) disease or predation;
(D) the inadequacy of existing regulatory mechanisms; or
(E) other natural or manmade factors affecting its continued existence.
16 U.S.C. § 1533(a)(1). The Act requires the Secretary to make his determination "solely on the basis of the best scientific and commercial data available to him.” Id. § 1533(b)(1)(A). In addition, the Secretary “shall ... determine on the basis of [a quinquennial] review whether any such species should ... be removed from [the list of endangered species] ... in accordance with the provisions of subsections (a) and (b) of this section.” Id. § 1533(c)(2)(B). The Secretary has delegated his responsibilities under the Act, as relevant here, to the Fish and Wildlife Service, 50 C.F.R. § 402.01(b), and so we refer to the Secretary and the agency interchangeably.

 Section 4(f)(1) provides: "The Secretary, in developing and implementing recovery plans, shall, to the maximum extent practicable ... incorporate in each plan ... objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list.” Id. § 1533(f)(1). Relatedly, § 4(f)(4) provides the "Secretary shall ... provide public notice and an opportunity for public review and comment” on any new plan or revision to an existing plan. Id. § 1533(f)(4).

 Although § 4(f) read in isolation might also be taken to mean the criteria in the recovery plan are sufficient but not necessary for delisting, that interpretation would conflict with § 4(c), which clearly requires the Secretary to apply to a delisting decision the five statutory factors in § 4(a).

 Although the district court did not reach the question whether the agency was arbitrary and capricious, we see no reason here to follow our general practice of remanding the case to the district court to consider that question in the first instance. See Piersall v. Winter, 435 F.3d 319, 325 (D.C.Cir.2006). The agency record is before us now just as it would be before the district court on remand and the district court has no comparative advantage in reviewing agency action for arbitrariness and capriciousness. Moreover, “a remand to the District Court, which inevitably would result in a future appeal to this court, would be a waste of judicial resources,” Grace v. Burger, 665 F.2d 1193, 1197 n. 9 (D.C.Cir. 1981) (internal quotation marks and citation omitted), aff d in part and vacated in part on other grounds sub nom., United States v. Grace, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983), where, as here, the merits of the question are clear.

 As usual, legislative history does not “definitively resolve!] the debate,” Dissent at 442 (internal quotation marks and citation omitted). Senate Report No. 100-240, which accompanied the Senate version of the bill that became the 1988 amendment, suggests the primary purpose of having "objective, measurable criteria” in recovery plans is to *438 provide a means by which the public can measure progress in the Secretary’s efforts at recovery of a species, see S. Rep. No. 100-240, at 4 ("most [past recovery plans] ... provide[d] no criteria by which to judge their success”); id. at 9 ("Section 4(f) of the Act is amended to require that each recovery plan incorporate ... criteria by which to judge success of the plan”); it simply does not speak to the question whether meeting those criteria is a precondition to the Secretary’s deciding to delist a species. Indeed, the latter part of the very sentence quoted in the dissent, see Dissent at 442, quoting S. Rep. No. 100-240, at 9-10 ("[t]he requirement that plans contain objective, measurable criteria for removal of a species from the Act's lists”), says a purpose of the objective criteria requirement is to "provide a means by which to judge the progress being made toward recovery,” S. Rep. No. 100-240, at 9, but makes no mention of limiting the Secretary’s delisting analysis.

 It is irrelevant whether the Service in fact interpreted the recovery plan criteria as binding when it published them in 1990, see Dissent at 443, because the Service later adopted through notice and comment an interpretation of those criteria as non-binding, see Delisting Rule, 73 Fed.Reg. at 50,226 ("Recovery plans are not regulatory documents and are instead intended to provide guidance to the Service, States, and other partners on methods of minimizing threats to listed species and on criteria that may be used to determine when recovery is achieved”); 71 Fed.Reg. at 75,924-25 (same).