# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued March 8, 2016　　　　Decided August 5, 2016

No. 15-5147

UNION NEIGHBORS UNITED, INC.,
APPELLANT

v.

SALLY JEWELL, IN HER OFFICIAL CAPACITY AS SECRETARY OF
THE UNITED STATES DEPARTMENT OF THE INTERIOR, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-01435)

---

*W. William Weeks* argued the cause and filed the briefs for appellant.

*Robert P. Stockman*, Attorney, U.S. Department of Justice, argued the cause for federal appellees. With him on the brief were *John C. Cruden*, Assistant Attorney General, and *David C. Shilton*, Attorney.

*Paul S. Weiland* argued the cause for intervenor-appellee Buckeye Wind LLC. With him on the brief was *Steven P. Quarles*.

2

Before: SRINIVASAN, MILLETT and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: Buckeye Wind, LLC ("Buckeye") wants to build a wind farm in Ohio. However, that wind farm may pose a danger to the Indiana bat, a federally listed endangered species. In order to comply with the Endangered Species Act ("ESA"), Buckeye applied for an incidental take permit with the United States Fish and Wildlife Service ("the Service") and submitted a conservation plan. The conservation plan provided that Buckeye would site its turbines away from known Indiana bat habitats, adjust the turbines' operating times and speeds, and protect additional habitat. The Service issued the permit.

Union Neighbors United, Inc. ("Union Neighbors") challenges the issue of the permit, claiming that the Service failed to comply with its obligations under the National Environmental Procedures Act ("NEPA") and failed to make required findings under the ESA. As to the Service's NEPA violations, Union Neighbors claims that it failed to consider a reasonable range of alternatives before issuing the permit. With regard to the ESA, Union Neighbors claims that the Service applied the incorrect standard in finding that Buckeye "to the maximum extent practicable, minimize[d] and mitigate[d] the impacts of such taking." 16 U.S.C. § 1539(a)(2)(B)(ii). We conclude the Service failed to comply with its NEPA obligations when it failed to consider an economically feasible alternative that would take fewer bats than Buckeye's proposal, and we reverse the District Court on that point. However, we also conclude that the Service's interpretation of the ESA is entitled to deference. In light of its interpretation, the Service complied with its ESA

obligations, and we affirm the judgment of the District Court on Union Neighbors' ESA claims accordingly.

**I.**

**A.**

The Service's decision to issue the permit to Buckeye implicates two statutory schemes: NEPA and the ESA.

NEPA "requires federal agencies . . . to consider and report on the environmental effect of their proposed actions." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 302 (D.C. Cir. 2013). "NEPA is an 'essentially procedural' statute intended to ensure 'fully informed and well-considered' decisionmaking . . . ." *New York v. NRC*, 681 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978)). "NEPA has twin aims. First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983) (internal quotation marks and citations omitted). An agency meets these aims through the preparation of an Environmental Impact Statement ("EIS") for agency action that will "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(C). The EIS must explore, *inter alia*, "the environmental impact of the proposed action," *id.* § 4332(C)(i); "any adverse environmental effects which cannot be avoided should the proposal be implemented," *id.* § 4332(C)(ii); and "alternatives to the proposed action," *id.*

§ 4332(C)(iii).[1] The discussion of alternatives must "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14.

The Service's decision to issue the permit also required compliance with the ESA. The ESA provides a means to conserve endangered or threatened species and their ecosystems. 16 U.S.C. § 1531(b). The Secretary of the Interior, who administers the ESA via the Service, lists endangered and threatened species and designates critical habitat for those species. *Id.* § 1533(a)(2)(A); (a)(3)(A). An endangered species is "any species which is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). The ESA prohibits the "take" of an endangered species within the United States. *Id.* § 1538(a)(1)(B). "Take" is a term of art that "means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). Although taking is prohibited, the Service may issue a permit to allow for an "incidental" taking, meaning the taking is "not the purpose of[] the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). In order to receive a permit, the applicant must submit a conservation plan that complies with certain specified requirements laid out at 16 U.S.C. § 1539(a)(2)(A).

After receiving the application, the Service publishes a notice and receives comment on whether the permit should issue. *See id.* § 1539(a)(2)(B); 50 C.F.R. § 17.22 (endangered species), 17.32(b)(1)(ii) (threatened species). The Service "shall issue the permit" if it receives "assurances" that the

---

[1] NEPA's implementing regulations apply to all federal agencies. *See* 40 C.F.R. § 1500.3.

conservation plan will be implemented and if it makes the following five findings:

> (i) the taking will be incidental;
> (ii) the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking;
> (iii) the applicant will ensure that adequate funding for the plan will be provided;
> (iv) the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild; and
> (v) the measures, if any, [otherwise required by the Secretary] will be met.

16 U.S.C. § 1539(a)(2)(B).

The ESA also requires federal agencies to insure that any action they "authorize[], fund[], or carr[y] out . . . is not likely to jeopardize the continued existence of any endangered species . . . or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). If agency action "may affect listed species or critical habitat," the agency must consult with the Service. 50 C.F.R. § 402.14(a). Consultation ends with the issuance of a Biological Opinion, 50 C.F.R. § 402.14(*l*), which examines whether the action will jeopardize the listed species or destroy or adversely modify its habitat as well as "those reasonable and prudent measures . . . necessary or appropriate to minimize such impact," 16 U.S.C. § 1536(b)(4).

Although Union Neighbors brings challenges under NEPA and the ESA, the Service's obligations are not identical under the two statutory schemes. NEPA's "mandate to . . . agencies is essentially procedural," *Vt. Yankee*, 435 U.S. at

558, in this case requiring the Service to consider reasonable alternatives to the proposed action, 42 U.S.C. § 4332(C)(iii); 40 C.F.R. § 1502.14. The ESA provisions at issue required the Service to make substantive findings. *See Gerber v. Norton*, 294 F.3d 173, 184-85 (D.C. Cir. 2002); *see also* 16 U.S.C. § 1539(a)(2)(B). Because the standards are not identical, a failure to comply with one statute does not necessarily result in a failure to comply with the other.

**B.**

The Indiana bat is a mouse-eared bat with habitats throughout the Eastern and Midwestern United States. During the winter, Indiana bats hibernate underground.[2] Although the largest population of hibernating Indiana bats is present in Kentucky, Missouri, and Indiana, large colonies have been found in abandoned underground mines in Illinois, Ohio, New Jersey, and New York. During the spring, Indiana bats migrate to their summer habitats. For the Indiana bat, the "core . . . summer range includes southern Iowa, northern Missouri, northern Illinois, northern Indiana, southern Michigan, and western Ohio." J.A. 254. Within Ohio, the Service has documented evidence of Indiana bat colonies in twenty-five counties. These summer ranges provide roosts for pregnant Indiana bats, which form colonies of 25 to 100 bats, with each bat producing one pup. The bats generally migrate to winter sites in late August.

Indiana bats were first listed as in danger of extinction in 1967 under the Endangered Species Preservation Act of 1966, and were listed as endangered under the ESA in 1973 following the law's enactment. The Indiana bat recovery plan

---

[2] The bats' hibernating habitat is called "hibernacula." Appellant Br. at 3; Fed. Appellees Br. at 6.

was first published in 1983 and later updated in 1999 and 2007. Although the overall Indiana bat population declined from 1965 to 2001, the trend reversed from 2001 through 2011, with the population increasing from 328,526 in 2001 to 424,708 in 2011. The Midwest Recovery Unit,[3] which includes Ohio, contains a population of approximately 305,297 Indiana bats. Despite these gains, several factors threaten the Indiana bat population, "including the loss and degradation of suitable hibernacula; human disturbance during hibernation; pesticides; . . . the loss, fragmentation, and degradation of forested habitat," J.A. 248; and white nose syndrome, a lethal fungus, *id.* at 249, 641. Wind farms pose a potential threat to bats generally, either through collisions with the turbines or as a result of decompression sickness caused by pressure changes around rotating turbine blades. However, as of April 2013, only five known Indiana bat deaths have been associated with wind farms.

## C.

Buckeye seeks to build and operate a commercial wind energy facility in Champaign County, Ohio. The proposed facility would include up to 100 wind turbines, each with a capacity of 1.6 to 2.5 Megawatts ("MW"), with a total

---

[3] "Recovery Units are a tool developed to maintain the distribution of wide-ranging species that have multiple populations or varying ecological pressures in different paths of the range . . . . Recovery Units are geographically or otherwise identifiable . . . ." U.S. Fish and Wildlife Service, *Indiana Bat (*Myotis sodalis*) Draft Recovery Plan: First Revision*, at 116, April 2007 [hereinafter 2007 Recovery Plan], *available at* https://www.fws.gov/midwest/endangered/mammals/inba/pdf/inba_ fnldrftrecpln_apr07.pdf. The Indiana Bat is grouped into four geographical Recovery Units: "Ozark-Central, Midwest, Appalachian Mountains, and Northeast." *Id.* at 8.

generating capacity of approximately 250 MW for the facility. Necessary construction and access infrastructure would be built as well. The site for the facility is a predominantly agricultural and rural area where Indiana bats maintain a presence during the summer maternity season and presumably traverse during spring and fall migrations to and from their hibernacula.[4]

In 2007, Buckeye began consulting with the Service and the Ohio Department of Natural Resources Division of Wildlife to determine the impact that its project would have on the local wildlife populations. After Buckeye consulted with the Service for several years and provided a number of pre-construction field studies, on January 29, 2010, the Service issued a notice of intent to initiate a scoping[5] period on the project and solicited public comments. Public scoping began on May 26, 2010, and the Service again solicited public comments regarding its intent to prepare a draft EIS and develop a Habitat Conservation Plan ("HCP" or "Conservation Plan") addressing the impact of Buckeye's proposed project. 75 Fed. Reg. 29575 (May 26, 2010); *see also* 40 C.F.R. § 1506.6(b) (requiring "public notice of NEPA-related hearings, public meetings, and the availability of environmental documents"). The Service worked with Buckeye to draft the HCP, and Buckeye submitted a completed application for its Incidental Take Permit ("ITP" or "Permit") in February 2012.

---

[4] The estimated number of Indiana bats traversing the area during summer ranged from 10.1 to 2,271.4, and the estimate during migration is approximately 5,800. J.A. 588.

[5] Scoping is the "process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action" to be addressed in an EIS. 40 C.F.R. § 1501.7.

On June 29, 2012, the Service issued a Draft EIS and Draft HCP for Buckeye's proposal and solicited public comments. The Service issued a Final EIS and Final HCP on Friday, April 18, 2013, and solicited public comments before a final decision on the permit. In the Final EIS, the Service identified the issuance of the ITP as the proposed government action. The Service also explained that the five "purposes for" the ITP and Final EIS were to: (1) "[r]espond to Buckeye Wind's application for an ITP for the . . . Indiana bat to related Project activities that have the potential to result in take . . .";  (2) "[p]rotect, conserve and enhance the Indiana bat and its habitat . . .";  (3) "[p]rovide a means and take steps to conserve the ecosystems depended on by the Indiana bat"; (4) "[e]nsure the long-term survival of the Indiana bat through protection and management of the species and its habitat"; and (5) "[e]nsure compliance with the ESA, NEPA, and other applicable Federal laws and regulations." J.A. 175. Because of the potential for commercial wind facilities to take a high number of bats, the Service identified "a need to ensure that take of Indiana bats is avoided and minimized to the maximum extent practicable and to ensure that the impact of any remaining take is fully mitigated" and to "protect the habitat of Indiana bats." J.A. 176. In furtherance of these objectives, the Service identified three options it could take under the ESA: 1) issue the ITP conditioned upon implementation of the HCP; 2) issue the ITP conditioned upon implementation of the HCP and other measures; or 3) deny the application for the ITP. The Service proposed issuing the Permit subject to Buckeye's Conservation Plan.

Buckeye's Conservation Plan proposes numerous steps to reduce impacts on the Indiana bat and its habitat, as well as impacts to other non-listed bats and birds. The HCP first attempts to minimize its impact on Indiana bats through the Action and Project Areas – those areas that could be affected

by the issuance of the Permit – and the locations of individual turbines. Specifically, the Conservation Plan moves the Action Area to a location 8 km (5 miles) away from a 2008 discovery of Indiana bats. Additionally, turbines are sited in already-developed lands where turbines would pose a reduced risk to the bats, and no turbine is sited within 2.9 km of known maternity roost trees discovered in 2009. Finally, only 10 of the 100 turbines are sited within habitat where the turbines would pose the greatest risk of impact to the Indiana bats.

The Conservation Plan also includes operational restrictions. Buckeye commits to both "turbine feathering" and increased "cut-in speeds." *See* J.A. 209-11, 757-60. Feathering is a "reduc[tion in] the blade angle to the wind to slow or stop the turbine from spinning[] until a designated cut-in speed is reached." J.A. 209. Cut-in speeds "are the wind speed at which rotors begin rotating and producing power." J.A. 209. The HCP varies the cut-in speeds up to 6.0 m/s based on the location of the turbine, the season, and the time of day.

The HCP estimated the impact on Indiana bat mortality using a collision model that accounted for, among other factors, population size, flight height, temperature, wind speed, and movement within the turbine array. Without implementing any of the operational restrictions, an estimated 6.9 to 25.4 bats would be killed per year. Using the operational restrictions, an estimated 5.2 bats would be taken per year, with no more than 26 Indiana bats in a 5 year period. The Service considered whether the estimated take of 5.2 bats per year would have significant consequences for the Indiana bat and determined that it would impact neither the Midwest Recovery Unit nor a local unit of a single maternity colony.

Finally, the HCP outlined additional mitigation measures related to habitat preservation and conservation funding. Buckeye intends to acquire and protect 217 acres of suitable habitat,[6] and to "restor[e] and/or enhance[]" suboptimal habitat, J.A. 768. Buckeye has also committed $200,000 to funding research and conservation efforts.

During scoping, the Service identified and considered six alternatives to Buckeye's proposal, three of which were analyzed in depth.[7] The alternatives "were primarily designed to address the potential for take of Indiana bats" and focused on the dates, times, and speed of turbine operation. J.A. 200. In addition to Buckeye's proposal, the Service analyzed in depth what it called 1) a maximally restricted operations alternative (the "Max Alternative"); 2) a minimally restricted operations alternative (the "Minimal Alternative"); and 3) a No Action Alternative. J.A. 219-22. The Service considered the three alternatives and Buckeye's proposal to determine the impacts on the Indiana bats and the outcome of the project. Under the No Action Alternative, the Service would not issue the ITP, no bats would be taken, and Buckeye would not construct the project. J.A. 220-21.

---

[6] The habitat is located within seven miles of a Priority 2 hibernaculum. The Indiana bat Recovery Plan categorizes hibernacula by priority numbers that reflect bat population and the significance of the habitat to Indiana bat recovery. *See* 2007 Recovery Plan, *supra*, at 20. Priority 2 hibernacula "[c]ontribute[] to the recovery and long-term conservation" of the Indiana bat and "have a current or observed historic population of 1,000 or greater but fewer than 10,000 and an appropriate microclimate." *Id.*

[7] The three alternatives the Service did not analyze in depth were: 1) an ITP of shorter duration; 2) a reduced number of turbines; and 3) an alternate location in Ohio. J.A. 195-96.

12

Buckeye's plan would take 5.2 Indiana bats per year. This take would not reduce the long-term viability of a local colony while also protecting 217 acres of suitable habitat. Buckeye's plan would generate 635,823 Megawatt-hours per year ("MWh/year") with zero emissions, offsetting 486,000 tons of carbon dioxide. J.A. 385. Buckeye's proposal would result in a 2.5% reduction in clean energy production, $980,000 in lost annual revenues, and $24.5 million in lost revenues over the ITP term from feathering. J.A. 808.

The Max Alternative would eliminate the take of any bats but would require shutting down all turbines from sunset to sunrise when Indiana bats are active. J.A. 220. Because no bats would be taken, no permit would need to issue. J.A. 219. However, no additional habitat would be preserved. J.A. 331-32. Only 491,587 MWh/year would be generated, and 22% fewer emissions would be reduced. J.A. 386. The maximally restrictive operations alternative would also result in a 22.7% reduction in clean energy, $8.65 million in lost annual revenues, and $216.5 million in lost revenues over the ITP term. J.A. 808.

The Minimal Alternative would have feathered all turbines to a cut-in speed of 5.0 meters per second ("m/s") during the fall migration period during the hours when the bats were most active. J.A. 220. This plan would have resulted in a take of 12 Indiana bats per year and over 300 bats over the life of the project, requiring Buckeye to purchase additional habitat for mitigation. J.A. 220. The Minimal Alternative would generate 647,726 MWh/year, offsetting more emissions. J.A. 386.

In public comments on the Final EIS, Union Neighbors asked the Service to consider a cut-in speed of 6.5 m/s as another alternative to Buckeye's proposed plan. J.A. 1053-

55, 1061-84.  In response, the Service "d[id] not disagree that higher cut-in speeds may result in less bat mortality," but because of the "infinite combinations of cut-in speeds higher than the proposed action, or even higher than 6.5 m/s that could be applied to reduce bat mortality more," it concluded the Max Alternative was "a reasonable alternative to consider in lieu of" Union Neighbors' proposed speed.  J.A. 1055.  The Service reasoned that the difference between Buckeye's proposal and the Max Alternative was "not significant," making analysis of other variations with higher cut-in speeds "not necessary."  J.A. 1054.

On July 18, 2013, the Service issued the ITP to Buckeye as well as its Record of Decision and Statement of Findings.  J.A. 1033.  The Service found that Buckeye's HCP "meets the statutory criteria for issuance of a . . . Permit, meets [Buckeye's] needs, and the []HCP provides an extensive set of conservation measures that minimizes and mitigates for the incidental take of the Indiana bat to the maximum extent practicable."  J.A. 1043.  The Service also issued a Biological Opinion concluding that Buckeye's proposal "is not likely to jeopardize the continued existence of the Indiana bat, and is not likely to destroy or adversely modify designated critical habitat."  J.A. 1001.

The Service also issued a Statement of Findings under Section 10(a)(1)(B) of the Endangered Species Act, 16 U.S.C. § 1539(a)(1)(B).  Specifically, the Service found that the taking was "incidental to and not the purpose" of Buckeye's project, J.A. 1023; that Buckeye had sufficient funding for mitigation, J.A. 1026; and that the taking was "not likely to appreciably reduce the likelihood of survival and recovery" of the Indiana bat, J.A. 1027.  The Service also found that the HCP

> minimizes and mitigates the impacts of take of the [Indiana bat] to the maximum extent practicable . . . because: (1) the HCP's minimization and mitigation measures effectively compensate for the impacts of take under the plan; [and] (2) the plan provides for adaptive management to adjust to changing conditions and adjusts mitigation costs over the life of the plan to fully fund its implementation.

J.A. 1025.

On September 20, 2013, Union Neighbors filed a complaint seeking declaratory and injunctive relief against the Secretary of the Department of the Interior, the Director of the Service, and the Regional Director for the Midwest region of the Service (collectively the "Federal Appellees"), alleging that the issuance of the ITP was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under NEPA and the ESA. Buckeye intervened. The parties cross-moved for summary judgment, and on March 18, 2015, the District Court denied Union Neighbors' motion and granted the Federal Appellees' and Buckeye's motions. *Union Neighbors United, Inc. v. Jewell*, 83 F. Supp. 3d 280, 283 (D.D.C. 2015). The District Court concluded that the Service satisfied the ESA's permit issuance criteria and that the Service's consideration of alternatives under NEPA was reasonable.[8] *Id.* at 286-89. Union Neighbors appeals.

---

[8] The District Court also addressed whether Union Neighbors had standing. Although not raised by the parties, we conclude Union Neighbors has standing for the reasons stated by the District Court in its opinion. *Union Neighbors United*, 83 F. Supp. 3d at 285-86.

15

## II.

We review the District Court's grant of summary judgment *de novo*, "as if the agency's decision 'had been appealed to this court directly.'" *Gerber*, 294 F.3d at 178 (quoting *Dr. Pepper/Seven-Up Cos. v. FTC*, 991 F.2d 859, 862 (D.C. Cir. 1993)). Because NEPA does not provide a private right of action, we review the Service's decision under the Administrative Procedure Act ("APA"), 5 U.S.C. § 501 *et seq. Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 72 (D.C. Cir. 2011). Likewise, we review the Service's ESA findings under the APA. *Gerber*, 294 F.3d at 178 & n.4. Under the APA, "our task is to determine whether the agency's decision was made 'without observance of procedure required by law,' 5 U.S.C. § 706(2)(D), or whether it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' *id.* § 706(2)(A)." *Id.* "[A]n agency acts arbitrarily or capriciously if it 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 997-98 (D.C. Cir. 2008) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## A.

Union Neighbors argues that the Service did not satisfy NEPA's requirement that it consider a reasonable range of alternatives because it failed to include among the alternatives an economically viable plan that would have taken fewer Indiana bats than Buckeye's compliance with the HCP. The

Federal Appellees and Buckeye contend that the Service considered a reasonable range of alternatives.

"Judicial review of agency actions under NEPA is available 'to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.'" *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1312-13 (D.C. Cir. 2014) (quoting *Baltimore Gas*, 462 U.S. at 97-98). "Where an issue 'requires a high level of technical expertise,' we 'defer to the informed discretion of the [agency].'" *Id.* at 1313 (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989)). "Although the standard of review is deferential, we have made it clear that '[s]imple, conclusory statements of "no impact" are not enough to fulfill an agency's duty under NEPA.'" *Id.* (quoting *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 154 (D.C. Cir. 1985)).

The alternatives to the proposed action are "the heart of the [EIS]." 40 C.F.R. § 1502.14. "Reasonable alternatives . . . . include[] alternatives that are technically and economically practical or feasible and meet the purpose and need of the proposed action." 43 C.F.R. § 46.420(b). We review the Service's selection of alternatives under the "rule of reason." *Theodore Roosevelt Conservation P'ship*, 661 F.3d at 72. "[A]n agency need follow only a 'rule of reason' in preparing an EIS, and . . . this rule of reason governs 'both *which* alternatives the agency must discuss, and the *extent* to which it must discuss them.'" *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991) (quoting *Alaska v. Andrus*, 580 F.2d 465, 475 (D.C. Cir. 1978)) (citation omitted). Under the rule of reason, "as long as the agency 'look[s] hard at the factors relevant to the definition of purpose,' we generally defer to the agency's reasonable definition of objectives." *Theodore Roosevelt Conservation*

*P'ship*, 661 F.3d at 72 (quoting *Citizens Against Burlington*, 938 F.2d at 196) (alteration in original). This is a deferential standard. *WildEarth Guardians*, 738 F.3d at 310. Furthermore, "where a federal agency is not the sponsor of a project, 'the Federal government's consideration of alternatives may accord substantial weight to the preferences of the applicant and/or sponsor in the siting and design of the project.'" *City of Grapevine v. Dep't of Transp.*, 17 F.3d 1502, 1506 (D.C. Cir. 1994) (quoting *Citizens Against Burlington*, 938 F.2d at 197)).

Because "[t]he goals of an action delimit the universe of the action's reasonable alternatives," *Citizens Against Burlington*, 938 F.2d at 195, we evaluate the Service's alternatives with its stated goals in mind. The Service explained that the five purposes of its action were: (1) responding to Buckeye's application for an incidental take permit for the Indiana bat; (2) "[p]rotect[ing], conserv[ing] and enhanc[ing] the Indiana bat and its habitat"; (3) "[p]rovid[ing] a means and tak[ing] steps to conserve the ecosystems" upon which the Indiana bat depends; (4) "[e]nsur[ing] the long-term survival of the Indiana bat"; and (5) complying with all federal laws and regulations. J.A. 175. At their core, these five purposes reflect "a need to ensure that take of Indiana bats is avoided and minimized to the maximum extent practicable and to ensure that the impact of any remaining take is fully mitigated" and "to protect the habitat of Indiana bats." J.A. 176.

The Federal Appellees recognize that the range of reasonable alternatives was designed to ensure preservation of the Indiana bat. Throughout their brief, the Federal Appellees reiterate the importance of an alternative that would reduce the take of bats while allowing the project to go forward. *See* Fed. Appellees Br. at 33 ("The [Max Alternative] reflects the

extent of operational restrictions necessary to ensure that the Project could still be built and operated, but without causing take."); *id.* at 33-34 (explaining how the Max Alternative provided a "valuable point of comparison . . . to compare the proposed Project to an alternative which reduced likely impacts to the Indiana bat to zero but still built the project" (emphasis omitted)).

The Service considered the following alternatives: Buckeye's plan incorporating variable cut-in speeds of up to 6.0 m/s at night from April to October; the No Action Alternative; the Minimal Alternative with a cut-in speed of 5.0 m/s for the first six hours after sunset from August to October; and the Max Alternative, which would have turned off the turbines at night from April to October. Viewing the range of alternatives through the lens of its stated goals, the Service failed to consider a reasonable range of alternatives because it did not consider any reasonable alternative that would be economically feasible while taking fewer bats than Buckeye's proposal. Buckeye's proposal would take 5.2 bats per year. The only alternative the Service considered that would take fewer bats was the Max Alternative. According to the Federal Appellees, the value of the Max Alternative was in the fact that it "eliminat[ed] Indiana bat mortality." Fed. Appellees Br. at 30. But the Federal Appellees concede that the Max Alternative is not an economically feasible alternative. *See id.* at 33 (noting higher costs and lower energy production with the Max Alternative). The Service knew, at a minimum, that Buckeye claimed a full nighttime option was not economically viable, and it was aware of other, more viable measures that would still take fewer bats than Buckeye's proposal—Union Neighbors repeatedly suggested using a cut-in speed higher than 6.0 m/s. Yet the Service failed to consider any higher cut-in speed in either the Draft or Final EIS. Because the Service in that context failed

to consider any economically feasible alternative that would take fewer Indiana bats than Buckeye's proposal, it failed to consider a reasonable range of alternatives.

The unreasonableness of the Service's failure to consider an economically viable alternative that would have taken fewer bats is evident after comparing the Draft EIS and Draft HCP with the Final EIS and the Final HCP. Attached to the Draft EIS was Buckeye's Draft HCP. In its Draft HCP, Buckeye outlined the additional costs that the Max Alternative would impose. *Proposed Habitat Conservation Plan & Incidental Take Permit for the Indiana Bat (*Myotis sodalis*) for the Buckeye Wind Power Project Champaign County, Ohio*, Vol. 2, Appx. B, at 219 (June 2012), http://regulations.gov (search for "FWS-R3-ES-2012-0036-0005"). This analysis is identical to the financial analysis included in the Final HCP. *See* J.A. 808. The Federal Appellees describe this analysis as "explaining *why* the [Max Alternative] was not economically viable." Fed. Appellees Br. at 33. Yet despite possessing this analysis at both the Draft and Final EIS stages, the Service considered only the same four alternatives in both the Draft EIS and Final EIS.

Furthermore, the Service's own responses to Union Neighbors' comments reflect the potential for a higher cut-in speed to more effectively align with its stated goals. Following notice of the final EIS, Union Neighbors submitted a comment asking the Service to consider the impact of a cut-in speed of 6.5 m/s. Although the Service recognized that "higher cut-in speeds may result in less bat mortality," it rejected analyzing a cut-in speed of 6.5 m/s because the difference between Buckeye's proposal and the Max Alternative was "not significant," making analysis of other variations with higher cut-in speeds "not necessary." J.A. 1054. Considering that one of the purposes behind the

issuance of the ITP was to "[p]rotect, conserve and enhance the Indiana bat and its habitat," J.A. 175, an analysis of whether an increased cut-in speed would still allow the project to go forward while protecting more Indiana bats would be consistent with this purpose.

The Federal Appellees argue that the Service did not need to consider another alternative because there "exists an infinite array of potential protective measures that could be varied depending on habitat, feathering, cut-in speed, and season, among many other factors." Fed. Appellees Br. at 31. But the Service would not need to examine an "infinite array," nor even examine Union Neighbors' proposed 6.5 m/s speed. An analysis of a realistic mid-range alternative with a cut-in speed that would take materially fewer bats than Buckeye's proposal while allowing the project to go forward would suffice. Although an agency "need not examine an infinite number of alternatives in infinite detail," *Allison v. Dep't of Transp.*, 908 F.2d 1024, 1031 (D.C. Cir. 1990), examining a reasonable alternative that could potentially take fewer bats than Buckeye's plan would "inform both the public and the decisionmaker," *Citizens Against Burlington*, 938 F.2d at 195, by "sharply defining the issues and providing a clear basis for choice among options," 40 C.F.R. § 1502.14.

Alternatively, the Federal Appellees argue that the Service already considered higher cut-in speeds separately by including the higher speeds in the literature supporting its analysis of the various alternatives. This argument would be compelling if only it were true. The Service's response to Union Neighbors' comment belies the Federal Appellees' argument here. When the Service rejected Union Neighbors' comment, it did not say that higher cut-in speeds were "effectively incorporated" or had been "previously considered" in its analysis. The Service stated simply that

considering a 6.5 m/s cut-in speed was "not necessary." J.A. 1054. Furthermore, although the adaptive management plan incorporates a speed of 6.5 m/s in certain scenarios, the Service's analysis does not suggest that the impacts would be identical to a consistent permanent cut-in speed. If cut-in speeds could potentially reduce additional impacts on bats, *see* J.A. 1054, and the adaptive plan operates under 6.5 m/s under certain scenarios, *see* J.A. 209-11, certainly the impacts would be different with constant cut-in speeds. The Service's failure to analyze a higher cut-in speed prevents us from accepting its conclusion.

Accordingly, because the Service in these circumstances did not consider any other reasonable alternative that would have taken fewer Indiana bats than Buckeye's plan, it failed to consider a reasonable range of alternatives and violated its obligations under NEPA. As a result, the Service's issuance of the ITP was arbitrary and capricious, and we reverse the District Court on Union Neighbors' NEPA claims.

**B.**

Union Neighbors also argues that the Service failed to comply with Section 10(a)(2)(B) of the ESA, 16 U.S.C. § 1539(a)(2)(B)(ii), which requires a finding that the applicant for an ITP "will, to the maximum extent practicable, minimize and mitigate the impacts of such taking." Specifically, Union Neighbors argues that the Service failed to fulfill this requirement in three ways: 1) failing to ensure that Buckeye would, to the maximum extent practicable, minimize the number of individual Indiana bats that would be taken; 2) applying an inappropriate standard to determine what constitutes the "maximum extent practicable"; and 3) failing to find that a reduced-impact alternative was

impracticable in contravention of *Gerber v. Norton*, 294 F.3d 173 (D.C. Cir. 2002).

**1.**

The Service made an official finding that Buckeye minimized and mitigated the impact on the Indiana bat to the maximum extent practicable. The Service noted that the ESA required it "to examine and predict the efficacy of [Buckeye's] proposed minimization and mitigation measures." J.A. 1023. It explained the criterion as follows: "Impacts to the species . . . of the proposed taking that are not avoided or eliminated as a result of project and HCP planning must be minimized to the maximum extent practicable. Any remaining impacts must then be mitigated (e.g., 'offset' or 'rectified') to the maximum extent practicable." *Id.*

The Service found "that Buckeye Wind will minimize and mitigate the impacts of take on the Indiana bat to the maximum extent practicable." J.A. 1024. First, the Service reasoned that Buckeye's approach "applies a biologically-based approach to minimizing take using avoidance measures" including "the use of feathering and cut-in speeds." *Id.* Additionally, Buckeye minimized take through its siting strategies and its application of "the strictest operational protocols (cut-in speeds) to turbines in the highest quality habitat areas and during the seasonal periods of highest risk." *Id.* Buckeye's use of cut-in speeds based on habitat quality rather than population also ensured minimization over the 30-year life of the permit. *See id.* Because "[t]he primary form of take of Indiana bats" was expected to be "mortality resulting from operation of the wind turbines," Buckeye's use of feathering and cut-in speeds would reduce the take by 68.3%, with additional reductions possible. *Id.*

The Service also considered Buckeye's proposed mitigation measures. Buckeye's "permanent protection of swarming habitat" would have two key effects: "enhanc[ing] reproductive success and increas[ing] the survival probability of Indiana bats that . . . overwintered in the hibernaculum." J.A. 1025. Moreover, because the "[t]he land will be protected in perpetuity," the benefits to the Indiana bat would outlast the ITP's duration. *Id.* Considering both the minimization and mitigation measures, the Service concluded that Buckeye's plan not only "fully compensates for impacts of the take to the" Indiana bat, but also "will assist in recovery of the species." *Id.* As a result, the Service found that Buckeye's "HCP minimizes and mitigates the impact of take of the [Indiana bat] to the maximum extent practicable." *Id.*

Furthermore, in response to substantive comments to the Final EIS,[9] the Service noted that its "analyses indicate that incidental take of individual bats associated with operation of the project is likely to have insignificant impacts on the subpopulations to which the taken individuals belong" and that Buckeye "has minimized the impact of the taking to the maximum extent practicable—to the extent that the impacts are insignificant." J.A. 1052. The official statement of findings also describes how "none of the Expected Take or Worst-case Take scenarios resulted in appreciable reductions relative to the Baseline scenario in any of the metrics" and "appreciable reductions in the fitness of the local maternity colonies, migratory maternity colonies, and winter populations to which the taken individuals belong are unlikely." J.A. 1021.

---

[9] The Service's official statement of findings also incorporated by reference its responses to comments on the Final EIS. *See* J.A. 1022.

24

Finally, in response to comments on the Draft EIS, to the extent that Buckeye was required to show that the Conservation Plan represented "the extent practicable" to which it could take action, the Service considered Buckeye to have shown that the Conservation Plan was all that could be "reasonably required" because the "maximum extent practical" threshold is not "economic infeasibility." J.A. 567-68. The Service explained that "the maximum extent practicable" standard "entails an analysis of the impact of the proposed taking on the species, as well as an analysis of how the mitigation proposal will offset those impacts." J.A. 568. As a result, "[i]f the mitigation fully offsets the impact of the taking, the Applicant has met the 'maximum extent practicable' standard." *Id.*

**2.**

Union Neighbors argues that the Service's findings fail to comply with the statutory requirements under the ESA. Union Neighbors' arguments – first, about what "impacts" must be minimized and mitigated, and, second, about the meaning of "the maximum extent practicable" – are questions of statutory interpretation. As a result, the Federal Appellees and Buckeye urge us to review the Service's interpretation under the two-step standard articulated in *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984).

"When it enacted the ESA, Congress delegated broad administrative and interpretive power to the Secretary." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 708 (1995). Accordingly, "[f]ashioning appropriate standards for issuing permits under § 10 for takings that would otherwise violate § 9 necessarily requires the exercise of broad discretion. . . . When Congress has entrusted the Secretary with broad discretion, we are

especially reluctant to substitute our views of wise policy for [the Secretary's]." *Id.* Generally, "[w]e review [the Service's] interpretation of the statute under the familiar two-step framework from [*Chevron*]." *Friends of Blackwater v. Salazar*, 691 F.3d 428, 432 (D.C. Cir. 2012). Under that standard, "[a]t Step One, the court asks 'if the statute unambiguously forecloses the agency's interpretation,'" *id.* (quoting *Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 663 (D.C. Cir. 2009)), and "if it does not, then at Step Two 'we defer to the administering agency's interpretation as long as it reflects "a permissible construction of the statute,"'" *id.* (quoting *Sherey v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011)).

The Service urges us to apply *Chevron* deference to interpretations outlined in the 1996 Habitat Conservation Planning and Incidental Take Permit Processing Handbook (the "Handbook"). *See* J.A. 1291. However, "not all statutory interpretations by agencies qualify for the level of deference afforded by that step." *Public Citizen, Inc. v. U.S. Dep't of Health & Human Servs.*, 332 F.3d 654, 659 (D.C. Cir. 2003). "*Chevron* deference [is] appropriate only where Congress has 'delegated authority to the agency generally to make rules carrying the force of law, and . . . the agency interpretation claiming deference was promulgated in the exercise of that authority.'" *Id.* (quoting *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001)). The Handbook itself makes clear that it is only a guide, stating that it establishes "detailed but flexible guidelines" that are not "intended to supersede or alter any aspect of Federal law or regulations pertaining to the conservation of endangered species." J.A. 1293. As a result, it is akin to "interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law [and] do not warrant *Chevron*-style deference." *Christensen*

*v. Harris Cnty.*, 529 U.S. 576, 587 (2000). However, where the deference we should accord an agency interpretation is unclear, "we need not reach the question of *Chevron* deference" if the Service's interpretation "satisfies the requirements for *Skidmore* deference." *Brown v. United States*, 327 F.3d 1198, 1205 (D.C. Cir. 2003) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 139 (1944)).

"Under *Skidmore*, the court grants an agency's interpretation only as much deference as its persuasiveness warrants." *Id.* Such interpretations reflect "a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore*, 323 U.S. at 140. We accord deference to the agency's interpretation in light of "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.* After considering the text, legislative history, and prior interpretations of the ESA, we find the Service's interpretations of the statute persuasive under *Skidmore*.

**a.**

Where Union Neighbors and the Service first disagree is whether the "impacts" that must be "minimized" refer to the discrete number of Indiana bats taken or to effects on the population and subpopulations of Indiana bats as a whole. Union Neighbors submits that the language of the statute, as well as its legislative history, supports interpreting the ESA to require that the Service find that Buckeye minimized and mitigated the impact on individual Indiana bats, not their population or subpopulations as a whole.

Union Neighbors first argues that the Service has accepted its definition of impacts, or alternatively, that certain Service emails show that it incorrectly applied a jeopardy standard in evaluating impacts. The "jeopardy" standard governs actions by federal agencies, which are required to show that their activities are "not likely to jeopardize the continued existence of any endangered species." 16 U.S.C. § 1536(a)(2). We can easily dispose of these arguments. Accepting that an individual bat death may be an impact does not mean that individual bat deaths are the sole impacts of such taking. Regarding the Service's emails, even assuming that the emails reflect an official statement, the jeopardy interpretation was not offered in the Service's findings and does not render those findings arbitrary or capricious. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658-59 (2007).

Turning to the statute itself, although its language is unclear, it suggests that "impacts" refers to more than the discrete number of individual members of a listed species. As Union Neighbors concedes, the statute does not define what "the impacts of such taking" are. *See* 16 U.S.C. § 1539(a)(2)(B)(ii); *id.* § 1532. However, the natural reading of "the impacts of such taking" is that "impacts" and "taking" are distinct concepts where the impact is the consequence of the take. Under Union Neighbors' reading, if the "take" is the death of 5 Indiana bats, the impacts of that take would be the death of 5 Indiana bats. Such a reading would render the word "impacts" superfluous. The more natural reading is that "impacts" refers to the effect of the taking on the species as a whole, which necessarily includes populations and subpopulations. *See* 16 U.S.C. § 1539(a)(2)(B)(iv) (requiring the Secretary to find that "the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild").

In an effort to make its preferred interpretation of "impacts" clear, Union Neighbors argues that the use of "impact" in ESA Section 7, 16 U.S.C. § 1536(b)(4), should inform the interpretation of Section 10 here. In Section 7, the ESA provides that the Secretary, after consultation for a Biological Opinion, should provide a written statement that "specifies the impact of such incidental taking on the species" and "specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact." 16 U.S.C. § 1536(b)(4)(C)(i)-(ii). Turning to Section 7's legislative history, Union Neighbors cites the 1982 House report that "Section 7(b)(4) requires the Secretary to specify the impact o[f] such incidental taking on the species. The committee does not intend that the Secretary will, in every instance, interpret the word 'impact' to be a precise number. Where possible, the impact should be specified in terms of a numerical limitation on the . . . permittee . . . ." H.R. Rep. No. 97-567, at 27 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 2807, 2827.

To the extent that this legislative history is probative, it is inconclusive. After all, not "every instance" of impact is "a precise number." *Id.* The House report even later notes that federal action need not be suspended in the event "the specified impact on the species is exceeded . . . unless it was clear that the impact of the additional taking would cause an irreversible and adverse impact on the species." *Id.* Clearly, impact includes the effects of the taking on the species population, not just individual members of the species. Furthermore, another House report explains that the Section 10 permitting provisions were designed with the "San Bruno Mountain Plan" in mind. *See* H.R. Rep. No. 97-835, at 31-32 (1982) (Conf. Rep.), *as reprinted in* 1982 U.S.C.C.A.N. 2860, 2872-73. Nowhere in the description of this plan does it mention minimizing the individual takings of two species of

endangered butterflies; rather, it notes that the plan "preserves sufficient habitat to allow for *enhancement of the survival of the species*." *Id.* at 32, *as reprinted in* 1982 U.S.C.C.A.N. 2873 (emphasis added).

Here, the Service submits that its interpretation in the Handbook is entitled to deference. Pursuant to the Handbook, the Service will find that an applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking following consideration of two factors: "adequacy of the minimization and mitigation program, and whether it is the maximum that can be practically implemented by the applicant." J.A. 1298. Additionally, "[t]o the extent maximum [sic] that the minimization and mitigation program can be demonstrated to provide substantial benefits to the species, less emphasis can be placed on the second factor." *Id.*

Presumably, the Service asks us to read the Handbook's language describing whether the minimization and mitigation programs "provide substantial benefits to the species" as reflecting that it has interpreted "impacts" to refer to populations and subpopulations rather than individual bats. Although that interpretation may be less than clear, it is consistent with the interpretation offered in the Service's responses to comments on the Final EIS that distinguish between individual bats and species-level impacts. The Service explained that "[t]he determination of whether or not a project has minimized the impacts of the taking to the maximum extent practicable is a biological standard that considers *how the species is impacted* by the taking and mitigation, and *not just the quantity of take*." J.A. 1050 (emphases added). The Service further noted that "[t]he impact of the taking . . . is dictated by the quantity of take and how it is distributed over time and population segments[,] . . .

how the populations to which the taken individuals belong respond to the loss of individuals, and how each subpopulation contributes to the population as a whole." J.A. 1050-51. In far more certain terms than it described in the Handbook, the Service stated: "the 'impact of the taking' is different than the quantity of taken individuals." J.A. 1051.

Considering the text of the statute, its legislative history, and the Service's interpretation of the statue, we are persuaded that the term "impacts" refers to the populations or subpopulations of the species as a whole, rather than the discrete number of individual members of the species. Accordingly, we defer to the Service's interpretation of the ESA under *Skidmore*, and its findings were not arbitrary or capricious.

**b.**

Union Neighbors' second statutory argument concerns the interplay between the phrases "to the maximum extent practicable" and "minimize and mitigate such impacts." According to Union Neighbors, the "maximum extent practicable" requirement operates independently on "minimize" and "mitigate." Union Neighbors contends that to comply with the ESA, the Service must first find that the number of individual Indiana bats taken was minimized to the maximum extent practicable. Because "practicable" means "reasonably capable of being accomplished," BLACK'S LAW DICTIONARY (10th ed. 2014), if Buckeye could further minimize the number of Indiana bats taken, it must. Only then could the Service determine whether Buckeye had mitigated that taking to the maximum extent practicable. Under Union Neighbors' reading, this would make the Service's finding, which accounted for minimization and

mitigation together before finding that such measures were to the "maximum extent practicable," a violation of the statute.

Union Neighbors' reading of the statute is plausible, but the Service's interpretation that the phrase "minimize and mitigate" creates a single duty is more persuasive and consistent with the statutory text. Specifically, the statute provides that the Secretary must find that "the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking." 16 U.S.C. 1539(a)(2)(B)(ii). First, the statute uses the conjunctive "and" between "minimize" and "mitigate," rather than "then," suggesting that the terms should be read together, not as a sequence. Further demonstrating that "minimize and mitigate" should be treated together is their shared object, "the impacts of such taking." Additionally, the structure of the statute, which enumerates independent findings the Secretary must make, supports this reading. Minimize and mitigate are part of a single finding the Secretary must make. *See* 16 U.S.C. § 1539(a)(2)(B). If they had to be made independently, the duties could have been imposed as independent findings the Secretary would have to make. If the Secretary finds that the applicant can "minimize and mitigate the impacts," the Secretary will have complied with its statutory duty. *See Nat'l Wildlife Fed'n. v. Norton*, 306 F. Supp. 2d 920, 927-28 (E.D. Cal. 2004) (discussing the relationship between minimize and mitigate). Accordingly, the text of the ESA supports reading "minimize and mitigate" jointly, and determining whether it has been done "to the maximum extent practicable."

Indeed, the Service's prior interpretations of the statute are largely consistent with this interpretation. The Service points us to the Handbook, which, as discussed above, treats the ESA finding as a "consideration of two factors: adequacy of the minimization and mitigation program, and whether it is

the maximum that can be practically implemented by the applicant." J.A. 1298. The Handbook also provides that "[t]o the extent maximum [sic] that the minimization and mitigation program can be demonstrated to provide substantial benefits to the species, less emphasis can be placed on the second factor." *Id.* According to the Service, this language demonstrates that it has interpreted the ESA to consider minimization and mitigation together, rather than sequentially.

Union Neighbors argues that the Service has not been consistent in its interpretation of the statute. For example, in its October 2011 revision to its Indiana Bat Section 7 and Section 10 Guidance for Wind Energy Projects, the Service described "[w]hat . . . 'minimize and mitigate to the maximum extent practicable' mean[s]." J.A. 1303. Specifically, the Service stated:

> We interpret this section to mean that the impacts of the proposed project, including the HCP, which were not *eliminated* through informal negotiation must be minimized to the maximum extent practicable and those remaining impacts that cannot be further minimized must be mitigated to the maximum extent practicable.

*Id.* This passage suggests that minimization and mitigation must be done independently to the maximum extent practicable. Yet the Guidance later treats minimization and mitigation as a single factor: "If applicants provide biologically based minimization measures and mitigation measures that are fully commensurate with the level of impacts, they have minimized and mitigated to the maximum extent practicable." *Id.* This one instance of ambiguity is

not enough to deprive the Service's interpretation of its persuasive power.

Finally, the Service's responses to comments provide the clearest picture about how the Service interprets the ESA's requirement that it find minimization and mitigation to the maximum extent practicable. The Service described its findings, noting that the cut-in speeds and feathering led the Service to determine that Buckeye "has minimized the quantity of take." J.A. 1051. Because the quantity of take would have "insignificant impacts on the subpopulations to which the taken individuals belong[ed]," the Service found that Buckeye "minimized the impact of the taking to the maximum extent practicable." J.A. 1052. Furthermore, Buckeye's mitigation measures would "contribute toward recovery of the species," meaning Buckeye "mitigated the impact of the taking to the maximum extent practicable." *Id.* After quoting the Handbook, the Service explained that "an assessment of economic feasibility can be considered in part of the assessment of the 'maximum that can be practically implemented by the Applicant,' particularly if the mitigation does not fully offset the impact of the taking." J.A. 1053. In this instance, "because the minimization and mitigation fully offset the impact of the taking," the Service found "it [was] not necessary to determine if the plan [was] the 'maximum that can be practically implemented by'" Buckeye. *Id.* In other words, if combined minimization and mitigation fully offset the take, it does not matter whether Buckeye *could* do more; Buckeye has already satisfied what is required under the ESA. Accordingly, the Service's ESA findings were not arbitrary or capricious.

**3.**

Union Neighbors' final salvo against the Service is *Gerber v. Norton*, 294 F.3d 173 (D.C. Cir. 2002). Union Neighbors contends that *Gerber* requires the Service to make an independent finding that no reduced impact alternative is practicable in order to find that Buckeye minimized and mitigated to the maximum extent practicable. Assuming without deciding that *Gerber* imposes such a requirement, the Service made the necessary finding that no identified reduced impact alternative was practicable.

In *Gerber*, we reviewed the issuance of a permit authorizing a taking of the endangered Delmarva fox squirrel. 294 F.3d at 175. The Defenders of Wildlife challenged the issuance of the permit as a violation of Section 10 of the ESA because the Service failed to find independently that "no practical alternative" to the proposed development plan "would minimize the taking of fox squirrels." *Id.* at 185. Because the Service "found, both in its draft and final Environmental Assessment, that there *was* a 'Reduced Impact Alternative' that 'would reduce the likelihood of take' of fox squirrels," "the agency could not have issued the permit consistent with section 10(a) without making a finding that the Reduced Impact Alternative was impracticable." *Id.* Although the developer found the Reduced Impact Alternative impracticable, the Service never did so. *Id.* at 185. Because the Service never made an independent finding that the alternative was impracticable, it necessarily failed to find that take had been minimized to the maximum extent practicable, violating the ESA. *Id.* at 186.

Assuming that *Gerber* has implications for a situation in which the agency (as here) finds that minimization and mitigation fully offset the take, on the record before the Court,

the Service complied with any applicable obligations described in *Gerber*. Union Neighbors contends that the Service "failed to make any independent determination that known reduced-impact alternatives would be impracticable," Appellant Br. at 55, which it defines as an alternative that would reduce individual bat mortality, *id* at 56. But Union Neighbors discounts the Service's analysis and rejection of the Max Alternative. *See* Appellant Br. at 58. Although the Max Alternative would take no Indiana bats, the Service found that only 491,587 MWh/y would be generated and 22% fewer emissions would be reduced. The Max Alternative would also result in a 22.7% reduction in clean energy; $8.65 million in lost annual revenues; and $216.5 million in lost revenues over the Permit term. J.A. 808. In the Service's Record of Decision for issuing the permit, it specifically found that it "would likely result in the Project not being built." J.A. 1043. These findings are sufficient to reject the practicability of the Max Alternative under Section 10.

Accordingly, at least with respect to the one reduced impact alternative identified by the agency and accepting its assumption that there were no other reduced impact alternatives, the Service complied with its purported obligations under *Gerber*. Union Neighbors submits that the Service failed to reject another known reduced impact alternative when it did not find a 6.5 m/s cut-in speed impracticable. But at this time we express no opinion whether, after analyzing another reasonable alternative under NEPA on remand, the Service has obligations under the ESA to make additional independent findings as to whether any such alternative is impracticable.

\* \* \*

For the foregoing reasons, we reverse in part and affirm in part the judgment of the District Court.

*So ordered.*